IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-6

No. 231A18

Filed 5 February 2021

THE COMMITTEE TO ELECT DAN FOREST, A POLITICAL COMMITTEE

v.

EMPLOYEES POLITICAL ACTION COMMITTEE (EMPAC), A POLITICAL COMMITTEE

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 260 N.C. App. 1 (2018), reversing an order of summary judgment entered on 15 February 2017 by Judge Allen Baddour in Superior Court, Wake County. On 5 December 2018, the Supreme Court allowed defendant's petition for discretionary review as to additional issues. Heard in the Supreme Court on 4 November 2019.

*Walker Law Firm, PLLC, by David Steven Walker, II, for plaintiff.*

*Stevens Martin Vaughn & Tadych, by C. Amanda Martin and Michael J. Tadych, for defendant.*

HUDSON, Justice.

¶ 1     At issue here is a question of first impression for our Court: whether the North Carolina Constitution limits the jurisdiction of our courts in the same manner as the standing requirements Article III imposes on federal courts, including the

requirement that the complaining party must show she has suffered "injury in fact," even where an Act of the North Carolina General Assembly expressly confers standing to sue on a party, as it did in N.C.G.S. § 163-278.39A(f) (2011) (now repealed).  We hold that it does not, and we affirm the decision of the Court of Appeals.[1]

## I.    Factual Background and Procedural History

In 2012, Linda Coleman and Dan Forest were, respectively, the Democratic and Republican candidates for Lieutenant Governor of North Carolina in the general election. The Employees Political Action Committee ("EMPAC" or "defendant"), a political action committee for the State Employees Association of North Carolina (SEANC), ran television advertisements supporting Ms. Coleman. According to plaintiff's complaint, the original version of the advertisement placed by EMPAC included a photograph of an individual that was approximately one-eighth the height of the full advertisement and, at any rate, was not a full-screen picture as then required by law. Furthermore, the individual in the picture, Dana Cope, was neither the Chief Executive Officer nor the treasurer of EMPAC as required by then-existing law.

---

[1] We also hold that discretionary review was improvidently allowed as to the additional issue.

After discovering the ad, the Committee to Elect Dan Forest (hereinafter, "plaintiff" or "the Committee") sent a notice and letter to the North Carolina State Board of Elections and EMPAC regarding the size of the picture. The notice did not mention that the wrong individual was pictured. EMPAC subsequently removed the advertisement and replaced it with one including a full-screen picture. The full-screen picture in the second advertisement was also of Mr. Cope, and therefore also failed to comply fully with disclosure requirements.

Mr. Forest ultimately won the 2012 election for Lieutenant Governor. Thereafter, on 9 March 2016, his Committee filed a complaint in the Superior Court of Wake County against EMPAC, alleging violations of N.C.G.S. § 163-278.39A.

In 1999, the North Carolina General Assembly enacted N.C. Session Law 1999-453, codified at N.C.G.S. § 163-278.38Z *et seq.* (2011) (hereinafter, "Disclosure Statute"), as a "Stand By Your Ad" law.[2] The Disclosure Statute provided specific requirements for television and radio ads placed by candidate campaign committees, political action committees, and others supporting or opposing candidates. *See generally* N.C.G.S. § 163-278.39A. In pertinent part, the Disclosure Statute provided that television ads by political action committees "shall include a disclosure statement spoken by the chief executive officer or treasurer of the political action

---

[2] N.C.G.S. § 163-278.39A was repealed by the General Assembly effective 1 January 2014. Session Law 2013-381, § 44.1.

committee and containing at least the following words: 'The [name of political action committee] political action committee sponsored this ad opposing/supporting [name of candidate] for [name of office].' " *Id.* § 163-278.39A(b)(3). Furthermore, the Disclosure Statute required that, for all ads on television falling under the statute, "an unobscured, full-screen picture containing the disclosing individual, either in photographic form or through the actual appearance of the disclosing individual on camera, shall be featured throughout the duration of the disclosure statement." *Id.* § 163-278.39A(b)(6).

The Disclosure Statute also included a notable enforcement mechanism. In a section entitled "Legal Remedy," it created a private cause of action as follows:

> [A] candidate for an elective office who complied with the television and radio disclosure requirements throughout that candidate's entire campaign shall have a monetary remedy in a civil action against (i) an opposing candidate or candidate committee whose television or radio advertisement violates these disclosure requirements and (ii) against any political party organization, political action committee, individual, or other sponsor whose advertisements for that elective office violates these disclosure requirements[.][3]

---

[3] A subsection of this section provided that, as a condition precedent to bringing suit under the statute, the complaining party must file a notice with the State Board of Elections or a county board of elections (for statewide and nonstatewide candidates, respectively) "after the airing of the advertisement but no later than the first Friday after the Tuesday on which the election occurred." N.C.G.S. § 163-278.39A(f)(1). The other subsections provided a formula for calculating damages, including treble damages in certain circumstances, and shifted attorneys' fees to a party found to be in violation of the statute. *Id.* §§ 163-278.39A(f)(2), (3).

*Id.* § 163-278.39A(f). The North Carolina Court of Appeals has previously characterized the cause of action created by the General Assembly in the Disclosure Statute as "unique in the world of election law." *Friends of Joe Sam Queen v. Ralph Hise for N.C. Senate,* 223 N.C. App. 395, 403 n.7 (2012).

¶ 7  Plaintiff's complaint alleged two violations of the Disclosure Statute by EMPAC: (1) from 8 October through 25 October 2012, EMPAC ran a television ad that did not include "a full-screened picture containing the disclosing individual" but a much smaller one; and (2) Mr. Cope, the individual pictured in both versions of the ad, was not in fact "the Chief Executive Officer or treasurer of EMPAC."[4] The complaint included as attachments an affidavit from Mr. Forest attesting the Committee was bringing the complaint on his behalf, records of the proposed schedule for ad run times with Time Warner Cable, the invoices for the ads, and copies of the notice and letter sent to the State Board of Elections and EMPAC. Defendant filed an answer and motion to dismiss based on lack of standing, which was denied. After failing to answer discovery, plaintiff voluntarily dismissed the lawsuit on 30 June 2015 and refiled on 9 March 2016.

---

[4] In order to preserve a claim under the Disclosure Statute, the Committee was required to file a Notice of Complaint with the State Board of Elections within a certain time period after the election. N.C.G.S. § 163-278.39A(f)(1) (2011). While the Forest Committee presented evidence that it had filed such a notice in a timely manner, the notice contained only the allegation of the incorrectly-sized picture, not the allegation relating to the identity of the disclosing individual. As a result, the Committee has not preserved the claim that this aspect of the Disclosure Statute was violated.

¶ 8    After discovery in the case proceeded, defendant filed a motion for summary judgment on 29 June 2016, arguing the Disclosure Statute violated the First Amendment as a content-based restriction on speech. After hearing the motion on 16 August 2016, the trial court entered an order on 15 February 2017 granting defendant's motion for summary judgment, stating that "plaintiff ha[d] failed to allege any forecast of damage other than speculative damage" and that "[i]n the absence of any forecast of actual demonstrable damages, the statute at issue is unconstitutional as applied."[5] Plaintiff gave timely notice of appeal to the North Carolina Court of Appeals.

¶ 9    In a split decision issued on 19 June 2018, the Court of Appeals reversed the trial court's grant of summary judgment to EMPAC. *Comm. to Elect Dan Forest v. Employees Pol. Action Comm. (EMPAC),* 260 N.C. App. 1, 2 (2018). The majority reasoned that by "actual demonstrable damages" the trial court meant the Committee lacked standing to sue because Mr. Forest had not shown adequate "injury." Relying on decisions of this Court, the majority held the Committee had standing to sue because the Disclosure Statute creates a private right of action for a candidate against a party when that party runs an ad in the candidate's election violating the

[5] We note it is not clear from the trial court's wording whether by this rationale it meant that plaintiff had not suffered injury sufficient to give it standing to sue or that the damage award imposed by the statute was constitutionally excessive without a showing of "actual demonstrable damages." The parties and the Court of Appeals addressed both of these arguments on appeal, so both arguments are preserved.

Statute and "the breach of the private right, itself, constitutes an injury which provides standing to seek recourse." *Id.* at 8. The majority further held the damages awarded under the Disclosure Statute were not unconstitutionally excessive even absent a showing of actual damages and that the Disclosure Statute did not *per se* violate the First Amendment, as EMPAC had argued on appeal. *Id.* at 11–12.

Chief Judge McGee dissented from the majority decision of the Court of Appeals, maintaining that plaintiff had not satisfied the condition precedent required by the Disclosure Statute and also that plaintiff lacked standing to sue because it had not shown "actual harm." *Id.* at 13 (McGee, C.J., dissenting). While noting that "North Carolina courts are not constitutionally bound by the standing jurisprudence established by the United States Supreme Court[,]" the dissent also noted that North Carolina appellate courts had previously applied United States Supreme Court decisions to questions of standing and, therefore, United States Supreme Court precedent is binding on the Court of Appeals. *Id.* at 14. The dissent noted that our courts have used the language "injury in fact" to describe the standing inquiry and then cited and extensively reviewed the recent United States Supreme Court decision in *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), to support the proposition that the North Carolina Constitution imposes the same "injury-in-fact" requirements of a "concrete" and "particularized" injury as the United States Constitution imposes on federal courts, including the implication that a statutory conferral of standing,

without more, does not necessarily give a party sufficient interest to have standing to sue. *Comm. to Elect Dan Forest*, 260 N.C. App. at 14–16. The dissent concluded, following the reasoning in *Spokeo*, that a statutory grant of standing does not necessarily confer standing on a party under the North Carolina Constitution absent a concrete and particularized injury in fact and, because the interests vindicated by the statute were public and not private, the Committee had not suffered adequate harm to satisfy the injury requirements for standing. *Id.* at 19.

EMPAC appealed to this Court based on the dissent. This Court also granted EMPAC's petition for discretionary review of additional issues, which asked this Court to determine whether the Disclosure Statute was an unconstitutional restriction on EMPAC's free-speech rights and what standard should apply to that inquiry.

## II. Standard of Review

We review the grant or denial of summary judgment *de novo*. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. 1A-1, Rule 56(c) (2019). In ruling on a summary judgment motion, we "consider the evidence in the light most favorable to

the non-movant, drawing all inferences in the non-movant's favor." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018). "We review constitutional questions de novo." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639 (2016).

## III.    Analysis

Defendant argues plaintiff has failed to establish an "injury in fact" sufficient to have standing to sue under the North Carolina Constitution. Plaintiff argues that, unlike the United States Constitution, the North Carolina Constitution does not require a plaintiff to make an additional showing of injury where a statutory right of action is conferred by the General Assembly in order for the case to come within the power of our courts. Whether the North Carolina Constitution limits the jurisdiction of our courts in the same manner as the standing requirements Article III[6] imposes on federal courts, including the requirement that the complaining party show "injury in fact," even where an Act of the General Assembly, such as the Disclosure Statute here, expressly confers a statutory cause of action, is a question of first impression for this Court.[7] While we have held the Court of Appeals errs in relying on federal standing doctrine, and, specifically, that "[w]hile federal standing doctrine can be instructive as to general principles . . . and for comparative analysis, the nuts and

---

[6] U.S. Const., Art. III, sec. 2.

[7] We note, as Chief Judge McGee did in dissent below, our Court of Appeals has previously decided that in some circumstances the federal standing requirements also apply to North Carolina law. *See, e.g., Neuse River Foundation, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113–15 (2002); *Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 390–92 (2005). This Court is not bound by those precedents.

bolts of North Carolina standing doctrine are not coincident with federal standing doctrine[,]" *Goldston v. State*, 361 N.C. 26, 35 (2006), we have declined to delineate those differences. Our silence on this fundamental matter has engendered substantial confusion and disagreement in the lower courts and we end it today.

¶ 14        North Carolina courts recognized nearly sixteen years before *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), that it is the duty of the judicial branch to interpret the law, including the North Carolina Constitution. *See Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787). This duty includes the responsibility to construe the limits on the powers of the branches of government created by our Constitution. *See, e.g., Cooper v. Berger*, 370 N.C. 392 (2018); *State ex rel. McCrory v. Berger*, 368 N.C. 633 (2016).

## A. Textual Analysis

¶ 15        As ours is a written constitution, we begin with the text. *See State ex rel. Martin v. Preston*, 325 N.C. 438, 449 (1989) ("In interpreting our Constitution—as in interpreting a statute—where the meaning is clear from the words used, we will not search for a meaning elsewhere.").

> The will of the people as expressed in the Constitution is the supreme law of the land. In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and compare it with other words and sentences with which it stands connected.

*Id.* at 449. In construing the document, "[w]e are guided by the basic principle of constitutional construction of giving effect to the intent of the framers." *State v. Webb*, 358 N.C. 92, 94 (2004) (cleaned up). "Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption. To ascertain the intent of those by whom the language was used, we must consider the conditions as they then existed and the purpose sought to be accomplished." *Id.*

Black's Law Dictionary defines "Standing" as "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary (11th ed. 2019). The term does not appear in the North Carolina Constitution, nor does it appear in the United States Constitution.[8] Instead, federal courts have construed

---

[8] Indeed, the term "standing" is of relatively recent vintage. *See* Joseph Vining, *Legal Identity: The Coming of Age of Public Law* 55 (1978) ("The word *standing* is rather recent in the basic judicial vocabulary and does not appear to have been commonly used until the middle of our own century. No authority that I have found introduces the term with proper explanations and apologies and announces that henceforth *standing* should be used to describe who may be heard by a judge. Nor was there any sudden adoption by tacit consent. The word appears here and there, spreading very gradually with no discernible pattern. Judges and lawyers found themselves using the term and did not ask why they did so or where it came from."). One scholar's search locates the United States Supreme Court's first use of the term "standing" as an Article III limitation in *Stark v. Wickard*, 321 U.S. 288 (1944). *See* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 169 (1992); *see also id.* ("The explosion of judicial interest in standing as a distinct body of constitutional law is an extraordinarily recent phenomenon."). Another scholar identifies the first use of the term in this sense by a justice of that court in *Coleman v. Miller*, 307 U.S. 433, 464-68 (1939) (Frankfurter, J., concurring). *See* Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1378 (1988).

Article III's limited extension of federal "Judicial Power" to hear certain categories of "Cases" and "Controversies" as giving rise to the standing requirement. U.S. Const. Art. III, § 2; *See, e.g., Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). Thus, at least as a matter of federal law, standing, along with other justiciability doctrines, is a limitation on the exercise of judicial power.

¶ 17        Article IV of the North Carolina Constitution delineates the State's judicial power as follows:

> The judicial power of the State shall, except as provided in Section 3 of this Article, be vested in a Court for the Trial of Impeachments and in a General Court of Justice. The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government, nor shall it establish or authorize any courts other than as permitted by this Article.

N.C. Const. Art. IV, § 1. As a matter of textual interpretation, we note this provision does not expressly define the term "judicial power." The provision also does not impose any express limitation on the exercise of the judicial power itself, such as the "case or controversy" requirement of the United States Constitution. To the contrary, the only limitation in the text of the provision protects the judicial power and jurisdiction of the courts from intrusion by the General Assembly except by vesting administrative agencies with judicial powers reasonably necessary to carry out their work under Article IV, Section 3. This provision was not enacted until the North Carolina Constitution of 1868, and has been readopted largely intact in subsequent

versions since then.[9] *See* N.C. Const. of 1868, art. IV., § 1; N.C. Const. of 1868, art. IV, § 1 (1935); N.C. Const. Art. IV, § 1 (1971).

¶ 18 This Court has previously tied another provision of our Constitution to the concept of standing: the remedy clause, an aspect of the open courts provision of Article I, Section 18, which states "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law[.]" N.C. Const. Art. I, § 18; *see Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642 (2008) (quoting N.C. Const. Art. I, § 18). A version of this provision was included in the Declaration of Rights in 1776, but the current text of the provision was not enacted until the 1868 Constitution as well. *See* N.C. Const. of 1776, Dec. of Rights, § XIII (1776); N.C. Const. of 1868, art. I, § 35. While the text of this provision does refer to "injury," the plain meaning of the provision prohibits the use of government power to *withhold* a remedy to an injured party; it does not appear on its face to limit the exercise of judicial power to any particular set of circumstances.

¶ 19 If the framers of our Constitution intended any limitation on the exercise of judicial power analogous to the standing requirements imposed by the federal

---

[9] Although the Constitution of 1776 did not include this provision, it did provide for the appointment of judges to the "Supreme Court of Law and Equity" by the General Assembly, and the Declaration of Rights enacted at that time included the familiar constitutional touchstone "[t]hat the legislative, executive, and supreme judicial powers of government, ought to be forever separate and distinct from each other." N.C. Const. of 1776, Declaration of Rights, § IV (1776).

constitution, it is not clear from the plain meaning of the constitutional text. Therefore, to determine what the framers meant by "judicial power" and other provisions including the remedy clause, in addition to "the text of the constitution," we must examine "the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *McCrory*, 368 N.C. at 639. We begin with surveying standing at common law before turning to a view of standing in federal caselaw and, finally, to our own Constitution and caselaw.

**B. English Common Law History**

English common law provides an important touchstone for determining the intent of the framers of both the federal and, in many cases, state constitutions.[10] " 'It is manifest,' said the General Assembly of North Carolina in 1715 'that the laws of England are the laws of this Government, so far as they are compatible with our way of living and trade.' " *State v. Willis*, 255 N.C. 473, 474 (1961) (quoting 17 N.C. L. Rev. 205). In 1778, in a statute that has continued unaltered since, the General Assembly of our newly constituted State adopted the common law:

> All such parts of the common law as were heretofore in
> force and use within this State, or so much of the common
> law as is not destructive of, or repugnant to, or inconsistent
> with, the freedom and independence of this State and the
> form of government therein established, and which has not
> been otherwise provided for in whole or in part, not

---

[10] We are not the first state supreme court to plough the fields of English common law as it pertains to standing under state constitutions. *See, e.g., Couey v. Atkins*, 357 Or. 460 (2015).

> abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State.

N.C.G.S. § 4-1 (2019). "The 'common law' referred to in N.C.G.S. § 4-1 has been held to be the common law of England as of the date of the signing of the American Declaration of Independence." *Gwathmey v. State*, 342 N.C. 287, 296 (1995). While the General Assembly may in general modify or repeal the common law, "any parts of the common law which are incorporated in our Constitution may be modified only by proper constitutional amendment." *Id.* (citing *State v. Mitchell*, 202 N.C. 439 (1932)). Thus, while not necessarily dispositive, the common law background is highly relevant to discerning the meaning of the constitutional text when it was adopted.

When examining "standing" (as a requirement for a personal stake in litigation) under English common law, the first thing one notes is its almost complete absence. Instead, "[b]efore and at the time of the framing [of the United States Constitution], the English practice was to allow strangers to have standing in the many cases involving the ancient prerogative writs." Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 171 (1992) (hereinafter, *Standing After* Lujan). A "stranger" in this sense means "[s]omeone who is not party to a given transaction" or "[o]ne not standing toward another in some relation implied in the context," therefore, one who lacks a personal stake in the litigation. "Stranger," Black's Law Dictionary (11th ed. 2019). The prerogative writs for which courts recognized the authority of strangers to sue to

enforce public rights included the writs of certiorari, prohibition, mandamus, and *quo warranto. See generally* Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265 (1961) (hereinafter *Standing to Secure*); Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 Yale L.J. 816 (1969) (hereinafter, *Standing to Sue*); John L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371 (1988) (hereinafter, *Metaphor*).

¶ 22    The extraordinary writs of certiorari[11] and prohibition[12] both authorized such "stranger suits." "The English tradition of *locus standi* in prohibition and certiorari is that 'a stranger' has standing, but relief in suits by strangers is discretionary. If, however, the official's lack of 'jurisdiction' [ ] appeared on the face of the record, relief followed as [a matter] of course." Jaffe, *Standing to Secure*, 74 Harv. L. Rev. at 1274.

---

[11] The prerogative writ of certiorari was the antecedent of this Court's own writ of certiorari. *See* N.C. R. App. P. 21; *see also* N.C. Const. art. IV, § 12 ("the [Supreme] Court may issue any remedial writs necessary to give it general supervision and control over the proceedings of the other courts."). As used by the King's Bench, however, it had a narrower function, generally reviewing the decisions of lower courts only for exceeding their jurisdiction in particular cases. Daniel R. Coquillette, *The Anglo-American Legal Heritage* 248 (1999). However, the writ was also used to regulate administrative agencies performing judicial functions. *See* Berger, *Standing to Sue*, 78 Yale L.J. at 821–22.

[12] Prohibition was "[a]n extraordinary writ issued by an appellate court to prevent a lower court from exceeding its jurisdiction or to prevent a nonjudicial officer or entity from exercising a power." "Prohibition," Black's Law Dictionary (11th ed. 2019). "The writ is so ancient that forms of it are given in Glanville . . . , the first book of English law, written in the year 1189." Forrest G. Ferris & Forrest G. Ferris, Jr., *The Law of Extraordinary Legal Remedies* 414–15 (1926). Like the writs of certiorari and mandamus, it persists today. *See* N.C. R. App. P. 22.

The *locus standi* rule permitting stranger suits "has been explained on the ground that a usurpation of jurisdiction, being an encroachment upon the royal prerogative, caused such concern that it made little difference who raised the question." *Id.*

First, English courts strongly defended the right of strangers to bring writs of prohibition. In a notable example, clergy complained to the king of excessive grants of writs of prohibition against ecclesiastical courts. In response, according to Lord Coke, "all the judges of England, and the barons of the Exchequer, with one unanimous consent," answered the charges in a seminal document called *Articulo Cleri*. The judges stated as follows in their Third Answer to the complaints:

> Prohibitions by law are to be granted at any time to restraine a court to intermeddle with, or execute any thing, which by law they ought not to hold plea of, and they are much mistaken that maintaine the contrary . . . . And the kings courts that may award prohibitions, being informed either by the parties themselves, *or by any stranger*, that any court temporall or ecclesiasticall doth hold plea of that (whereof they have not jurisdiction) may lawfully prohibit the same, as well after judgment and execution, as before.

Edward Coke, 2 *Institutes of the Laws of England* 602 (1797) (emphasis added).[13]

Similarly, the writ of certiorari in English practice could be brought by strangers.[14]

¶ 24 The prerogative writ of mandamus was also extended to strangers without a personal stake. Professor Louis Jaffe has described the writ of mandamus[15] as being "invented" by Lord Coke, sitting on the King's Bench, "if not out of whole cloth then at least out of a few rags and tatters[.]" Jaffe, *Standing to Secure*, 74 Harv. L. Rev. at 1269. In *James Bagg's Case*, Lord Coke, reasoning the first assertion of jurisdiction through the writ was justified "so that no Wrong or Injury, either Publick or Private, can be done, but that it shall be reformed or punished by due Course of Law."[16] 11

---

[13] Professor Raoul Berger makes the following observation regarding this passage: "No English court, so far as I can discover, has ever rejected the authority of *Articulo Cleri* or denied that a writ of prohibition may be granted at the suit of a stranger. On the contrary, Coke was cited by the 18th century Abridgments and by English courts throughout the 19th century, and his rule remains the law in England today. Thus, at the time of the [American] Revolution, the 'courts in Westminster' afforded to a stranger a means of attack on jurisdictional excesses without requiring a showing of injury to his personal interest." Berger, *Standing to Sue*, 78 Yale L.J. at 819–20 (footnotes omitted); *see also Wadsworth v. Queen of Spain*, 17 Q.B. 171, 214 (1851) ("[W]e find it laid down in books of the highest authority that, where the court to which prohibition is to go has no jurisdiction, a prohibition may be granted upon the request of a *stranger*, as well as of the defendant himself." (citing 2 Coke 607)).

[14] In *Arthur v. Commissioners of Sewers*, 88 Eng. Rep. 237 (K.B. 1725), for instance, the King's Bench distinguished between a party with a personal stake and "one who comes merely as a stranger," in determining whether the remedy of a writ of certiorari was mandatory or merely discretionary.

[15] Mandamus being then, as now, "[a] writ issued by a court to compel performance of a particular act by a lower court or a governmental officer or body[.]" "Mandamus," Black's Law Dictionary (11th ed. 2019); *see Sutton v. Figgatt*, 280 N.C. 89, 93 (1971) ("The writ of mandamus is an order from a court of competent jurisdiction to a board, corporation, inferior court, officer or person commanding the performance of a specified official duty imposed by law."); N.C. R. App. P. 22.

[16] Lord Coke's rationale for the assertion of jurisdiction through mandamus is, as further discussed below, an exposition of Magna Carta that two-and-a-half centuries later

Coke 93b, 98a, 77 Eng. Rep. 1271, 1278 (K.B. 1615). English cases have long held that, in matters of public right, anyone may seek the writ of mandamus to enforce the public's interest.[17] *See People ex rel. Case v. Collins*, 19 Wend. 56, 65-66 (N.Y. Sup. Ct. 1837) (collecting English cases in which party obtaining mandamus in name of king was a private person without a personal interest); *id.* at 65 ("It is at least the right, if not the duty of every citizen to interfere and see that a public offence be properly pursued and punished, and that a public grievance be remedied.").

The writ for *quo warranto* also contemplated suit by a stranger.[18] *See, e.g., Rex v. Smith*, 100 Eng. Rep. 740 (1790) (discussing *Rex v. Brown* (1789), in which writ of *quo warranto* was granted despite "it [] not appear[ing that] the party making the application ha[d] any connection with the corporation [(a municipal government)]" because "the ground on which this application is made to enforce a general Act of Parliament, which interests all the corporations of the kingdom; and therefore it is

---

would become the remedy clause in our Constitution's Declaration of Rights. *Cf.* N.C. Const. Art. I, § 18 ("every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law[.]").

[17] Professor Jaffe notes "I have encountered no case before 1807 in which the standing of plaintiff is mooted, though the lists of the cases in the digest strongly suggest the possibility that the plaintiff in some of them was without a personal interest." Jaffe, *Standing to Secure*, 74 Harv. L. Rev. at 1271.

[18] "Quo Warranto," was "[a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." "Quo Warranto," Black's Law Dictionary (11th ed. 2019). The writ of *quo warranto* was ultimately modified by England's Statute of Anne, 9 Anne c. 20 (1710), after which the statutory "information in nature of *quo warranto*" lied instead. *See Saunders v. Gatling*, 81 N.C. 298, 300 (1879).

no objection that the party applying is not a member of the corporation."). *See also*

Berger, *Standing to Sue*, 78 Yale L. J. at 823 (discussing same).

¶ 26      Finally, English law recognized the practice of "informers" and "relators"

actions, which presaged modern "private attorney general actions."

> ["Informers" actions] went beyond making *available*
> procedures to control unlawful conduct, and offered
> financial *inducements* to strangers to prosecute such
> actions, provided for by a "very large" number of statutes
> "in which the public at large was encouraged to enforce
> obedience to statutes by the promise of a share of the
> penalty imposed for disobedience . . ." Such informers had
> "no interest whatever in the controversy other than that
> given by statute," and the pecuniary reward thus offered to
> strangers was little calculated to read cognate remedies
> narrowly.

Berger, *Standing to Sue*, 78 Yale L. J. at 825–26 (footnotes omitted).[19] A "relator"

action, often for a writ of *quo warranto*, could be brought by the Attorney General,

according to Blackstone, "at the relation of any person desiring to prosecute the same,

(who is then styled the *relator*). . . ." William Blackstone, 3 *Commentaries on the Laws*

*of England* 264. The relator need have no personal interest in the matter apart from

the public interest. *See, e.g., Rex v. Mayor of Hartford*, 91 Eng. Rep. 325 (1700) (*quo*

*warranto* issued against mayor and alderman to show 'by what authority they

---

[19] *See also Martin v. Trout*, 199 U.S. 212, 225 (1905) ("Statutes providing for actions
by a common informer, who himself had no interest whatever in the controversy other than
that given by statute, have been in existence hundreds of years in England, and in this
country ever since the foundation of our government.").

admitted persons to be freemen of the corporation who did not inhabit in the borough. The motion was pretended to be on behalf of freemen, who by this means were encroached upon." (emphasis added)).

¶ 27        In summary, under English common law practice, which informs our interpretation of the intent of the framers of our State's constitutional text, the concept of "standing," as a personal stake, aggrievement, or injury as a prerequisite for litigation brought to vindicate public rights, was basically absent.[20] Instead, the English practice included the prerogative writs and informers and relators actions, which "took forms astonishingly similar to the 'standingless' public action or 'private attorney general' model that modern standing law is designed to thwart." Winter, *Metaphor*, 40 Stan. L. Rev. at 1396. To the extent the framers of the North Carolina Constitution were informed by the English common law which so suffused the development of law in America in crafting our constitutional text, we must conclude the use of the term "judicial power" excluded any requirement that there be "actual harm" or "injury in fact" apart from the existence of a legal right or cause of action to have standing to invoke the power of the courts in this State. This was almost certainly the intent of the original framers of the North Carolina Constitution in 1776 in establishing a "Supreme Court of Justice in Law and Equity" and recognizing a

---

[20] *See* Jaffe, *Standing to Secure*, 74 Harv. L. Rev. at 1270; Berger, *Standing to Sue*, 78 Yale L.J. at 827 Winter, *Metaphor*, 40 Stan. L. Rev. at 1374.

"judicial power[]" to be preserved "ever separate and distinct" from the legislative and executive powers. N.C. Const. of 1776, Declaration of Rights, § IV (1776).

Of course, Article IV of our Constitution which now delineates the judicial power is a product of the transformative 1868 Reconstruction convention and the most recent reorganization of our Constitution in 1971, along with the major amendments in 1935. Therefore, one may object that, whatever the meaning of the term as used by colonial lawyers raised on the English common law in 1776, that meaning no longer holds today. We therefore examine the law of standing as it evolved in America and, in particular, North Carolina to determine if that meaning still applies.

## C. The American Experience

In the century following the Revolution, the American states, including North Carolina, inherited the English common law of prerogative writs and, in general, drew a distinction between writs enforcing private rights, which required a showing of legal right or injury (i.e., the existence of a cause of action, as a matter of substantive—not constitutional—law), and those enforcing public rights, which could be brought by anyone or, at its most restrictive, a citizen or taxpayer. *See Couey*, 357 Or. at 496–98 (summarizing the caselaw of the period). Furthermore, in the late-nineteenth and early-twentieth centuries state courts, including in North Carolina,

began expressing a concern with mootness, not as a constitutional but as a discretionary, prudential limitation on judicial power. *See id.* at 498–99.

¶ 30     One early case reveals the early framers' conception of the judicial powers of this Court, including the power to hear prerogative writs, relative to the English courts. In *Griffin v. Graham*, (1 Hawks) 8 N.C. 96 (1820), this Court, acting in equity, heard a complaint from the would-be heirs of a decedent who instead sought to create a trust for the establishment of a free school for indigent students. *Griffin*, 8 N.C. at 97–99. This Court held the charitable trust was valid and the court had jurisdiction to declare it so because, per the reporter's headnotes,

> though the jurisdiction of charities in England belong[ed] to the Court of Chancery, not as a Court of Equity, but as administering the prerogative of the Crown, the Court of Equity of this state hath the like jurisdiction: for, upon the revolution, the political rights and duties of the King devolved upon the people in their sovereign capacity; and they, by their representatives, have placed this power in the Courts of Equity, by the acts of Assembly of 1778, c. 5, and 1782, c. 11.

*Griffin*, 8 N.C. at 97. Thus, this Court necessarily recognized it inherited the same jurisdiction, including the expansive prerogative writs, now in the name of the sovereign people rather than the Crown, through the statute now codified at N.C.G.S. § 4-1, discussed above. Although the language is not couched in constitutional terms, this early decision interpreting the acts of the first session of our General Assembly is persuasive evidence of what the framers of our 1776 Constitution believed the

content and limits of judicial power to be. Chief Justice Taylor, speaking for a majority of the Court, recognized, as a matter of *parens patriae*, the authority of the Court of Chancery in England (and thus, by statutory succession, the Court of Equity in North Carolina) to hear an "information for a charitable trust" filed *ex officio* by the Attorney General "*at the relation of some informant*, where it is necessary."[21] *Id.* at 133 (emphasis added).

¶ 31     Broad access to the prerogative writs for vindication of public rights without a showing of personal interest was widely accepted in the nineteenth century. By 1875, the United States Supreme Court recognized "[t]here [wa]s . . . a decided preponderance of American authority in favor of the doctrine, that private persons may move for a [writ of] *mandamus* to enforce a public duty, not due to the government as such, without the intervention of the government law-officer." *Union Pac. R. Co. v. Hall,* 91 U.S. 343, 355 (1875) (citing many cases from several states).

---

[21] Although this Court did not address what, if any, interest the relator must have to invoke the court's jurisdiction, William J. Gaston, who would become a justice of this Court, was one of the trustees and is reported to have argued before the Court that North Carolina law permitted a writ of mandamus filed by a relator in the absence of a personal interest to vindicate the public's interest. 8 N.C. at 124–25 ("It is well settled, that the discretion of the trustees does not make it the less a charity: nor does it oppose the right of this Court to interfere; for, in all cases of discretionary powers, if they be abused, the Court will interfere, and by virtue of its general jurisdiction over trusts, will take the trust out of impure hands, and place it in honester. And, upon a bill in the name of the Attorney-General, (and any person, however remotely concerned, may be *relator*,) the Court will compel the trust to act, or to assign the trust.").

The Supreme Court of Illinois, in one of the cases cited therein, summarized the difference between private rights and public rights:

> The question, who shall be the relator . . . depends upon the object to be attained by the writ. Where the remedy is resorted to for the purpose of enforcing a private right, the person interested in having the right enforced, must become the relator. . . . A stranger is not permitted officiously to interfere, and sue out a mandamus in a matter of private concern. But where the object is the enforcement of a public right, the People are regarded as the real party, and the relator need not show that he has any legal interest in the result. It is enough that he is interested, as a citizen, in having the laws executed, and the right in question enforced.

*Pike Cnty. Comm'rs v. Illinois ex rel. Metz*, 11 Ill. 202, 207–08 (1849).

¶ 32 This Court followed the majority trend in recognizing the right of persons without any personal interest or injury to pursue actions to vindicate a public right throughout the nineteenth century. For instance, this Court, without any further showing or discussion of his interest, permitted a plaintiff "as a citizen and taxpayer of the state," to bring an action for mandamus against the secretary of state. *Carr v. Coke*, 116 N.C. 223, 223 (1895).

¶ 33 Another example concerns actions by private relators under section 366 of the Code of Civil Procedure of 1868, which, largely following the Statute of Anne, abolished the writ of *quo warranto* and provided a statutory action in the nature of a writ of *quo warranto* for private persons as relator to challenge the wrongful occupation of municipal offices in the name of the state, with the permission of the

Attorney General. In 1892, this Court heard an action under the statute filed in the name of the state by a taxpayer and citizen of Greensboro against the appointment of a police chief, who challenged the suit on the grounds that the relator "d[id] not allege that he is entitled to the office, nor has any interest in its emoluments, and therefore is not a proper relator." *State ex rel. Foard v. Hall*, 111 N.C. 369, 369 (1892). This Court held that, under the statute, "[i]t is not necessary that the relator should have such interest." *Id.* This Court reasoned that "In many instances . . . when an office is illegally held or usurped, there is no one else who can claim a title thereto. In such cases, unless a voter or taxpayer (not a mere stranger)[22] can bring the action by leave of the attorney general, there would often be no remedy[.]" *Id.* at 370. Other cases interpreting the *quo warranto* statute show that any private person can bring an action under it and the purpose of the statute is to vindicate public, not private, rights. *See Ellison v. Raleigh*, 89 N.C. 125, 132 (1883) (holding the statute "seems to contemplate the action as one open upon the complaint of any private party[.]"); *Saunders v. Gatling*, 81 N.C. 298, 301 (1879) ("It is not merely an action to redress the grievance of a private person who claims a right to the office, but the public has

---

[22] Although this Court limited the class of persons who could bring the action to citizens or taxpayers as opposed to "mere strangers," this was a matter of statutory, rather than constitutional, interpretation. This Court later cited *Hall* in dismissing a complaint brought by a relator under the statute for failing to allege as a matter of substantive law under the relevant code section that he was a citizen or taxpayer of the county and thus did not show he was a "party in interest" under the Code of Civil Procedure. *State ex rel. Hines v. Vann*, 118 N.C. 3, 6 (1896) (citing N.C. Code Civ. P. of 1868, § 177).

an interest in the question which the legislature by these provisions of the code seems to have considered paramount to that of the private rights of the persons aggrieved[.]”).

¶ 34     These cases demonstrate that in North Carolina, as in a "decided preponderance" of states throughout the nineteenth century, *see Union Pac. R. Co.*, 91 U.S. at 355, the writ of mandamus and the successor by statute of the writ of *quo warranto* were both broadly available for the vindication of public rights common to all citizens and taxpayers, without any required showing of a personal interest. Even where such a showing was required, such as where a private right was asserted, it was treated as a matter of substantive, not constitutional law.[23]

**D. Federal Standing Law and the "Case" or "Controversy" Requirement**

¶ 35     Before resolving the question at hand under the North Carolina Constitution, we must examine the federal law of standing arising under the United States

---

[23] Standing is not the only modern "justiciability" doctrine not located in the North Carolina Constitution in the nineteenth century. For instance, despite the lack of statutory or common law authority, this Court at times has approved of courts in equity advising trustees as to the discharge of trusts. *See, e.g., Simpson v. Wallace*, 83 N.C. 477, 479 (1880). In certain cases, mootness, too, was regarded, not as a matter of constitutional law, but a matter of discretion and prudence. *See State ex rel. Martin v. Sloan*, 69 N.C. 128, 128 (1873) (holding when "neither party has any interest in the case except as to cost[,]" this Court "[is] not in the habit of deciding the case."); *State v. Richmond & D.R. Co.*, 74 N.C. 287, 289 (1876) (holding the same). However, this Court expressly held that "[i]f feigned issues "—those collusively brought to test the validity of a law—" were ever valid in this State, they are abolished by the Constitution, Art. 4, § 1." *Blake v. Askew*, 76 N.C. 325, 326 (1877).

Constitution.[24] Federal justiciability doctrines—standing, ripeness, mootness, and the prohibition against advisory opinions—are not explicit within the constitutional text, but are the fruit of judicial interpretation of Article III's extension of the "judicial Power" to certain "Cases" or "Controversies."[25] U.S. Const. art. III, § 2; *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (cleaned up)); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) ("Standing to sue or defend is an aspect of the case or controversy requirement."). Chief Justice Earl Warren, writing for the United States Supreme Court, articulated the complex role of the federal case or controversy requirement:

---

[24] One might query whether this digression is necessary. As the law of standing evolved essentially and originally as a matter of federal law in the twentieth century, and our courts have on certain occasions turned to federal law to apply standing under our own laws, we believe it is. *See* Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.1 (3d ed. 2020) ("As academic as the history may seem, it serves vitally important purposes. Current standing law is an incredibly rich tapestry woven from all the strands that have been twisted by the wheels of time. No single approach has become finally dominant; none has gone to eternal rest. Workaday answers to many specific questions can be found in some areas, but other questions can be argued and answered only with full knowledge of the intellectual heritage."). It is particularly necessary to understand the odd federal "strands twisted" into the fabric of the law of North Carolina.

[25] The political question doctrine, another justiciability doctrine, has its roots in part in Article III, but also in the "textually demonstrable constitutional commitment" of certain questions to the *other* "political departments" by other parts of the Constitution's text, *see, e.g., Nixon v. United States*, 506 U.S. 224, 229 (1993) (holding nonjusticiable Senate's impeachment proceedings due to Article I's provision that Senate has "sole Power to try all Impeachments"), and prudential considerations regarding the appropriate role of federal courts in the federal constitutional schema. *See Baker v. Carr*, 369 U.S. 186, 217 (1962).

> [T]hose two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case and controversy doctrine.

*Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). The meaning of these provisions to the framers is not described and the only evidence in the records of the Constitutional Convention is James Madison's statement that judicial power ought "to be limited to cases of a judiciary nature."[26] As we previously noted, the North Carolina Constitution lacks this provision.

The prohibition against advisory opinions by federal courts is, by far, "the oldest and most consistent thread in the federal law of justiciability[.]" Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3529.1 (3d ed. 2020). The rule against advisory opinions plainly originates in Article III's case or controversy requirement, as well as concerns about separation of powers. *Clinton v. Jones*, 520 U.S. 681, 700 (1997)

---

[26] *See* F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 278 (2008) (quoting 2 Records of the Federal Conventions of 1787 at 430 (Max Farrand ed., rev. ed. 1966)).

("[T]he judicial power to decide cases and controversies does not include the provision of purely advisory opinions to the Executive, or permit the federal courts to resolve non justiciable questions." (footnotes omitted)). The prohibition was first recognized in the refusal of the Supreme Court to give advice to the Secretary of War and Congress on pension applications from veterans of the Revolution, in support of which the Court held " '[N]either the Legislature nor the Executive branches can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner.' " *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.† (1792) (an unnumbered footnote quoting the circuit court opinion below). Moreover, in a famous letter submitted in response to Secretary of State Thomas Jefferson's request for the Court to advise President Washington on certain questions about the neutral status of the United States in the French Revolutionary Wars of 1793, Chief Justice John Jay writing for the members of the Court but not *as* the Court, emphasized the separation of powers in declining to do so:

> The lines of separation drawn by the Constitution between the three departments of the government—their being in certain respects checks upon each other—and our being judges of a court of the last resort—are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to; especially as the power given by the Constitution to the President, of calling on the heads of departments for opinions, seems to have been *purposely* as well as expressly united to the *executive* departments.

Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 (cleaned up) (available at https://founders.archives.gov/documents/Washington/05-13-02-0263). As an aspect of the prohibition against advisory opinions, the Court held it could not hear collusive suits, and that exercise of the judicial power required adverse parties. *See, e.g., Poe v. Ullman*, 367 U.S. 497, 505 (1961); *United States v. Johnson*, 319 U.S. 302, 305 (1943).

¶ 37    In contrast to the well-established rule against advisory opinions, standing doctrine is of comparatively recent origin. *See* Winter, *Metaphor*, 40 Stan. L. Rev. at 1374 ("[A] painstaking search of the historical material demonstrates that—for the first 150 years of the Republic—the Framers, the first Congresses, and the Court were oblivious to the modern conception either that standing is a component of the constitutional phrase 'cases or controversies' or that it is a prerequisite for seeking governmental compliance with the law."). As federal standing evolved from a requirement that a party have a cause of action to an increasingly restrictive tool curbing access to federal courts, the doctrine has been challenged by many scholars for inconsistency. *See* Gene R. Nichol, Jr., *Rethinking Standing*, 72 Cal. L. Rev. 68, 68 (1984) ("In perhaps no other area of constitutional law has scholarly commentary been so uniformly critical."). Even the Supreme Court has acknowledged this doctrinal confusion. *See Valley Forge Christian College v. Americans United for*

*Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("We need not mince words when we say that the concept of 'Art. III standing" has not been defined with complete consistency . . . .").

¶ 38        From the founding to well into the twentieth century, cases addressing the justiciability of parties to maintain a suit turned on whether the party could maintain a cause of action. *See* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 170. If the common law or a statute gave them a cause of action, that was all that was required for the case to come within the judicial power. *See Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 819 (1824) ("[The judicial] power is capable of acting only when the subject is submitted to it, by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares that the judicial power shall extend to all cases arising under the constitution, laws and treaties of the United States."); Winter, *Metaphor*, 40 Stan. L. Rev. at 1395 (standing was contained in the question "whether the matter before it fit one of the recognized forms of action."). As in state courts, federal courts also recognized the right to sue to redress public harms without a showing of a particular private interest. One of the most notable early cases addressing the justiciability of a case when the party lacked a particular interest or injury was *Union Pacific Railroad v. Hall*, 91 U.S. 343 (1875), in which the Supreme Court allowed a mandamus petition brought by merchants under a general mandamus statute to compel a chartered railroad to build a railroad

line. The Supreme Court recognized the merchants attempted to enforce "a duty to the public generally" and they "had no interest other than such as belonged to others." *Id.* at 354. The ultimate question—"whether a writ of *mandamus* to compel the performance of a public duty may be issued at the instance of a private relator" without a "special injury"—was answered in the affirmative. *Id.* at 354. The existence of the right to bring an action for mandamus under the statute, confirmed by the Court's examination of the widespread acceptance of public actions without particular injuries in America, settled the question; the Court raised no issue of an additional showing of a "peculiar and special" injury being required as a matter of constitutional law. *Id.* at 355. Moreover, the existence since the first Congress of federal *qui tam* and informer's actions that permitted individuals to file suit without a personal interest support the view that Article III was not understood to impose any greater requirement for injury or a personal interest where a congressional act created a cause of action. *See* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 176–77.

¶ 39       Standing doctrine as a distinct constitutional requirement under Article III first arose in the middle part of the twentieth century, largely at the hands of Justices Brandeis and, later, Frankfurter, partially in response to the emergence of the administrative state and constitutional attacks on progressive federal legislative programs. *See* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 179; F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 276

(2008).[27] These cases primarily involved constitutional challenges to legislative enactments and government action without a common law cause of action or one arising under a statute. Importantly, in most of the cases, there was also no clear right created in the federal constitution that did not run to the public at large. *See, e.g., Frothingham v. Mellon*, 262 U.S. 447, 488 (1923) (Tenth Amendment challenge); *Ex Parte Levitt*, 302 U.S. 633, 633 (1937) (challenge alleged violation of Article I, § 6). The cases of this period, although not until later explicitly defining the inquiry in terms of "standing," were consistent with the longstanding concern only that the plaintiff show some right under common law, a statutory source, or the constitution.[28] *See, e.g., Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 159 (1951)

---

[27] As several commentators have noted, in a pair of decisions, Justice Frankfurter attempted to ground the new standing requirements in the historical practice of the "courts at Westminster," even though these requirements are essentially inconsistent with the history summarized above. *See, e.g.,* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 172; Winter, *Metaphor*, 40 Stan. L. Rev. at 1394–95; Berger, *Standing to Sue*, 78 Yale L.J. at 816. For an empirical review of Supreme Court decisions by parts validating and criticizing the claimed impact of liberal justices, including Justices Brandeis and Frankfurter, in this early period, *see generally* Daniel E. Ho & Erica L. Ross, *Did Liberal Justices Invent the Standing Doctrine? An Empirical Study of the Evolution of Standing, 1921-2006*, 62 Stan. L. Rev. 591 (2010).

[28] Although as Professor Sunstein notes the direct cause of action arising under the constitution recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), was still a long way off, Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 180, as Professor Andrew Hessick notes, early in this period the Supreme Court recognized there was standing arising directly under the Fourteenth Amendment in *Pierce v. Society of Sisters*, 268 U.S. 510, 535–36 (1925). *See* Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. at 291, n.97. For our purposes, the relevance of *Pierce* is that the plaintiffs' standing to sue was recognized where there was a right under the constitution.

(Frankfurter, J., concurring) ("Only on the ground that the organizations assert no interest protected in analogous situations at common law, by statute, or by the Constitution, therefore, can plausible challenge to their 'standing' here be made."). In the absence of such a "legal right," factual injury was insufficient. *See Tennessee Elec. Power Co. v. Tennessee Val. Authority*, 306 U.S. 118, 137–38 (1939).

¶ 40    In the most notable case of this period, *Frothingham v. Mellon*, 262 U.S. 447 (1923), the Supreme Court held a person may not sue only as a federal taxpayer who shares a grievance in common with all other federal taxpayers.[29] In *Frothingham*, the plaintiff sued as a federal taxpayer seeking to restrain the expenditure of federal funds on grants to the states through the Maternity Act of 1921 by arguing it violated the Tenth Amendment reservation of powers to the states. *Id.* at 486. The Supreme Court rejected the challenge. In holding the plaintiff's suit could not be maintained, the Court first held the plaintiff could not avail herself of the equitable powers of the federal courts because, as opposed to a taxpayer of a municipality, her "interest in the moneys of the [federal] treasury . . . is comparatively minute and indeterminable," and, therefore, obtaining an injunction as a remedy is inappropriate *Id.* at 487. The Court suggested that concerns about administrability and separation

---

[29] The Supreme Court's first dismissal under this rationale was decided a year before in an opinion authored by Justice Brandeis. *See Fairchild v. Hughes*, 258 U.S. 126 (1922) ("Plaintiffs alleged interest [as a taxpayer] in the question submitted is not such as to afford a basis for this proceeding."). *See* Winter, *Metaphor*, 40 Stan. L.R. at 1376.

of powers informed its decision on the exercise of courts' equitable power. *Id.* at 487

("If one taxpayer may champion and litigate such a cause, then every other taxpayer

may do the same, not only in respect of the statute here under review, but also in

respect of every other appropriation act and statute whose administration requires

the outlay of public money, and whose validity may be questioned."). The Court

provided a further rationale: it "ha[s] no power per se" of judicial review, but "[t]hat

question may be considered only when the justification for some direct injury suffered

or threatened, presenting a justiciable issue, is made to rest upon such an act." *Id.* at

488. Thus "[t]he party who invokes the power must be able to show, not only that the

statute is invalid, but that he has sustained or is immediately in danger of sustaining

some direct injury as the result of its enforcement, and not merely that he suffers in

some indefinite way in common with people generally." *Id.*

¶ 41        While *Frothingham* first explained the prohibition against taxpayer standing,

*Ex parte Levitt*, 302 U.S. 633 (1937), announced the prohibition against citizen

standing. In *Levitt*, the plaintiff sued "as a citizen and a member of the bar of [the

United States Supreme] Court" challenging the appointment of Justice Hugo Black

as an Associate Justice of the Supreme Court arguing that, as a sitting United States

Senator, he was ineligible under Article I, § 6.[30] 302 U.S. 635–36. The Supreme Court

---

[30] The clause in question provides that "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which . . . the Emoluments whereof shall have been [i]ncreased during such

held, citing *Frothingham* and other cases involving third-party standing, "[i]t is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." *Id.* at 636.

¶ 42      Taken together, *Frothingham* and *Levitt* establish a general prohibition against "generalized grievances"—in which the plaintiff alleges only an injury he shares in common with all other taxpayers or citizens and alleges no direct injury— to challenge the constitutionality of legislative or executive action in federal court. Some have contended *Frothingham*'s prohibition on taxpayer standing and its reasoning is "prudential"—that is, it is a product of judicial self-restraint—while others contend it is constitutional and a product of the case or controversy requirement.[31] Indeed, even one of the progenitors of modern standing, Justice Brandeis, conceived of it as a prudential, not jurisdictional limitation.[32] *See*

---

time." U.S. Const. art. I, § 6, cl.2. The salaries of the Supreme Court had been raised while Justice Black served as Senator.

[31] Professor Jaffe, for instance, contended *Frothingham* can be reconciled with the history of 'standingless' public actions in that it "can rest on the ground that until Congress decides otherwise, there is no need for a *generally available* federal taxpayer's action." Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255, 303 (1961).

[32] Whether a standing requirement such as the prohibition against generalized grievances and attendant requirement for "direct injury" is prudential or jurisdictional may seem academic, but it is a vital distinction. If a limitation is adopted as an exercise in

*Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346, 346–48 (1936) (Brandeis, J., concurring) (holding that "[t]he court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation[,]" is a rule of constitutional avoidance the Supreme Court developed "for its own governance in the cases *confessedly within its jurisdiction.*" (citing *Mellon*, 262 U.S. 447) (emphasis added)).

An important development in the law of standing happened in the middle of the twentieth century when the federal Administrative Procedure Act (APA) was enacted in 1946. In an important provision, the APA provided "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (2018). The "legal wrong" prong authorized suits based on invasion of common law interests or invasion or disregard of interests protected by a governing statute. *See* Sunstein, *Standing after* Lujan, 91 Mich. L. Rev. at 181–82; *id.* at 182, n.94 ("[T]he key point is that the APA did not require an explicit grant, but instead inferred a cause of action (standing) from the existence of an interest that the agency was entitled to consider."). The second prong, creating a statutory cause of action for persons "adversely affected or aggrieved by agency action within the meaning of a

---

prudential self-restraint by the judiciary, Congress (or the legislature) may enact a statute conferring standing on persons in cases the courts would otherwise decline to hear.

relevant statute" served to confer standing on persons as private attorneys general. The Court had previously interpreted an analogous provision of the Communications Act of 1934 to give standing to persons "only as representatives of the public interest." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 14 (1942).

¶ 44     Beginning in the early 1960s, the Supreme Court under Chief Justice Earl Warren, perhaps recognizing the restrictiveness of its standing decisions, applied a "pragmatic and functional strain" of standing doctrine. Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.1 (3d ed. 2020); *See* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 183–84 ; Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. at 292–93. After *Frothingham* and *Levitt*, the first Supreme Court decision to address standing again in detail was *Baker v. Carr*, 369 U.S. 186 (1962). In *Baker*, the Supreme Court held that citizens who suffered vote dilution based on malapportionment had standing to sue under the Equal Protection Clause. *See id.* at 207 ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as aright secured by the Constitution[.]"). In support of its holding, the Supreme Court articulated a rationale that has become a "refrain" if not a "shibboleth" in standing decisions, Nichol, *Rethinking Standing*, 72 Cal. L. Rev. at 71, including our own:

> A federal court cannot "pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." Have

> the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing.

*Baker*, 369 U.S. at 205 (citation omitted) (quoting *Liverpool, N.Y. & P. Steamship Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885)).

Notably, the Supreme Court rested its decision not on any recent standing case, including *Frothingham* or *Levitt*, but instead on the old principle requiring an "actual controversy," or, in the *Baker* Court's term, "concrete adverseness." In *Liverpool, N.Y. & P. Steamship*, the Court noted that it would not pass upon the constitutionality of acts of Congress "as an abstract question" because "[t]hat is not the mode in which this court is accustomed or willing to consider such questions." *Liverpool, N.Y. & P. Steamship*, 113 U.S. at 39. Although it described the requirement for an "actual controvers[y]" was "jurisdictional," it reasoned that "in the exercise of that jurisdiction," it is bound by rules that are essentially functional and prudential. *See id.* (holding the court is bound by rules of constitutional avoidance as "safe guides to sound judgment" and "[i]t is the dictate of wisdom to follow them closely and carefully").

Besides the overarching rationale that standing is predicated on a prudential concern for sharpening legal issues, nowhere does the *Baker* opinion suggest a need for "injury in fact." To the contrary, the only injury asserted is the impairment of a

constitutional right broadly shared and divorced from any "factual" harm experienced by the plaintiffs. *See* Winter, *Metaphor*, 40 Stan. L. Rev. at 1380 (describing the "voter's interest in the relative weight of his or her vote" at issue in *Baker* as "a matter that is a purely legal construct dependent on one's conceptualization of a properly weighted vote").

¶ 47      Toward the end of the Warren era, the Supreme Court again addressed standing in the context of a taxpayer suit, attempting to resolve the dispute generated by *Frothingham* about whether the prohibition against federal taxpayer standing was an absolute constitutional bar or a prudential concern. In *Flast v. Cohen*, 392 U.S. 83 (1968), the Court seemingly reversed course on *Frothingham*, and held that federal income taxpayers had standing to challenge the use of federal funds to support instructional activities and materials in religious schools. *Id.* at 88. In support of this holding, Chief Justice Warren, writing for the Court, turned toward *Baker*'s functional approach rather than *Frothingham*'s concern with separation of powers:

> The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in

> standing problems is on whether the party invoking federal
> court jurisdiction has "a personal stake in the outcome of
> the controversy," . . . and whether the dispute touches
> upon "the legal relations of parties having adverse legal
> interests."

*Id.* at 100–01 (quoting *Baker*, 369 U.S. at 205). After announcing these broad principles, the Court introduced a test to determine whether there was sufficient personal stake in a taxpayer standing suit by requiring "a logical nexus between the status asserted and the claim sought to be adjudicated." *Id.* at 102. In the context of a taxpayer suit, the taxpayer must show the challenged statute was an exercise of Congress's power to tax and spend under Article I, § 8, and, if so, that the challenged enactment violates specific constitutional limitations on that power. In *Flast*, the Court held the expenditures were a result of the spending power and the Establishment Clause specifically limited the exercise of that power. Thus, there was standing. In contrast, the Court held, *Frothingham* lacked such a nexus.

¶ 48      The "nexus test" announced in *Flast* has been much-criticized.[33] Subsequently, the Court has essentially confined its scope to analysis of taxpayer standing claims under the taxing and spending power of Article I, § 8. For our purposes, *Flast* is relevant for cementing the 'pragmatic and functional strain' of *Baker*'s requirement for "concrete adverseness" and a sufficiently "personal stake in the outcome of the

---

[33] *See, e.g.*, *United States v. Richardson*, 418 U.S. at 182 (Powell, J., concurring) ("[I]t is impossible to see how an inquiry about the existence of 'concrete adverseness' is furthered by the application of the *Flast* test.").

controversy," and also for significantly limiting the apparently broad scope of *Frothingham*'s prohibition against federal taxpayer standing in constitutional litigation.

¶ 49     While *Baker* and *Flast* involved rights arising directly under the constitution, this era also saw an expansion in standing based on rights created by statute. There was, of course, general acceptance that an express conferral of standing by Congress created a right to sue. *See McGrath*, 341 U.S. at 151–53 (Frankfurter, J., concurring). This included private attorney general actions where the plaintiff alleged no *personal* interest of their own besides the right to sue created by the statute. *See, e.g., Scripps-Howard Radio*, 316 U.S. at 14 (recognizing that Congress permits litigants "standing only as representatives of the public interest."). Furthermore, the objects of statutes—that is, those regulated, as distinguished from the beneficiaries of such regulation—had standing under the APA where they had a personal interest at stake that was protected by the statute. *See* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 182 ("People could bring suit if they could show that 'a relevant statute' . . . granted them standing by providing that people 'adversely affected or aggrieved' were entitled to bring suit. In this way, the APA recognized that Congress had allowed people to have causes of action, and hence standing, even if their interests were not entitled to consideration by the relevant agency." (footnote omitted)). In the decade following *Flast* courts went further, concluding that the

beneficiaries of regulatory programs, as well as their objects, had standing to sue to challenge government action—as well as administrative *in*action. *See id.* at 183 (citing cases from 1960 through 1975 where "courts concluded that displaced urban residents, listeners of radio stations, and users of the environment could proceed against the government to redress an agency's legally insufficient regulatory protection"). The "legal interest" test, which was exemplified by Justice Frankfurter's concurrence in *McGrath*, under which plaintiffs had standing if they suffered infringement of a right at common law, by statute, or under the constitution, *McGrath*, 341 U.S. at 151–53 (Frankfurter, J., concurring), was thus "read to allow standing for beneficiaries, who often faced statutory harm—'legal injury'—by virtue of inadequate regulatory action." Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. at 184; *see Hardin v. Kentucky Utilities Co.*, 390 U.S. 1 (1968) (holding that "no explicit statutory provision [was] necessary to confer standing," since the private utility bringing suit was "in the class which [the statute was] designed to protect"); Louis L. Jaffe, *Standing Again*, 84 Harv. L. Rev. 633, 633 (1972).

¶ 50 However, the Court did not stop with expanding the legal interest test. Nor did it decide that a private person could challenge any alleged violation of the public interest. Instead, in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), the Supreme Court abandoned the legal interest test, distinguishing it by reasoning that it "goes to the merits," and unanimously held for

the first time that a plaintiff could challenge a government action by alleging "injury in fact." 397 U.S. at 152–53. The factual injury could, but need not be, economic. *See id.* at 152. In particular, the court recognized that "aesthetic, conservational, and recreational" interests, or even "a spiritual stake" could support standing under the "injury in fact" test. *Id.* at 154 (citations omitted); *see also* Gene R. Nichol, Jr., *Injury and the Disintegration of Article III*, 74 Cal. L. Rev. 1915, 1921 (1986) (identifying cases in which the Supreme Court subsequently recognized these injuries, as well as other nontraditional injuries). Plainly the injury-in-fact test was intended to expand standing to new categories of plaintiffs beyond that conferred by the legal interest test. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39 (1976) ("Reduction of the threshold requirement to actual injury redressable by the court represented a substantial broadening of access to the federal courts over that previously thought to be the constitutional minimum under [the APA]."). This expansion soon presented problems, however. *See* Nichol, *Rethinking Standing*, 72 Cal. L. Rev. at 75 (noting that, in some cases, injury-in-fact-test relied on injuries "that were not only intangible, but also subjective" and, in others, could not be separated from legal interests). Although *Data Processing* intended to expand standing, not restrict it, *Data Processing*'s injury-in-fact test paved the way for the restriction of standing to come. *See* Laurence H. Tribe, 1 *American Constitutional Law* 394 (3d ed. 2000) ("By decoupling standing from questions of substantive law,

the *Data Processing* Court sowed the initial seeds of doubt regarding Congress' power to create standing where private rights were not infringed.").

¶ 51        The attempt to expand standing under the injury-in-fact test announced in *Data Processing* and the adoption of a pragmatic and functional approach to the question in *Baker* and *Flast* soon gave way to doctrinal change that tightened standing requirements and limited access to federal courts in the Burger era. In a series of cases addressing constitutional challenges to legislation, the Supreme Court reversed course on the pragmatic approach to standing, grounding it instead in separation of powers—a view it had expressly rejected in the prior era. *See Flast*, 392 U.S. at 100 ("[W]hether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems.").

¶ 52        In a pair of decisions handed down the same day, the Court held there was no standing in a case alleging the failure to publish the CIA's budget violated Article I, § 9, or in a challenge to the ability of members of Congress to simultaneously serve in the Armed Forces Reserve under the incompatibility clause of Article I, § 6, cl. 2. *United States v. Richardson*, 418 U.S. 166 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974). In *Schlesinger*, the Court held a plaintiff cannot rely on citizen standing if his interest is " 'undifferentiated' from that of all other citizens." *Id.* at 217. While the Court in part defended this position in terms of *Baker*'s need for a personal stake to ensure adversary presentation, the decision primarily

turned on separation-of-powers concerns, noting that since "every provision of the Constitution was meant to serve the interests of all," and permitting standing under all constitutional provisions would "ha[ve] no boundaries" and ultimately "distort the role of the Judiciary in its relationship to the Executive and the Legislature . . . ." *Id.* at 226–27, 222. Similarly, in *Richardson*, the Court held there was no citizen or taxpayer standing to challenge legislation shielding the CIA budget from public disclosure under the Statement and Account Clause, U.S. Const. art. I, sec. 9, cl. 7. *Richardson*, 418 U.S. at 175. In his concurrence, Justice Powell reasoned that "taxpayer or citizen advocacy, given its potentially broad base, is precisely the type of leverage that in a democracy ought to be employed against the branches that were intended to be responsive to public attitudes." *Id.* at 189 (Powell, J., concurring). *Richardson*, too, tightened taxpayer and citizen standing based primarily on separation-of-powers grounds.  Finally, in *Valley Forge*, the Court nevertheless found no standing for a taxpayer challenging the federal government transfer of public property to a religious institution under the Establishment Clause, distinguishing it from *Flast* on the grounds that it was executive not legislative action, thus cabining the conceivably broad access to taxpayer standing under *Flast*. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982).

¶ 53 These cases reaffirm and extend the prohibition against generalized grievances, making clear that "undifferentiated" or "abstract" rights under the constitution were not sufficient to confer standing. Moreover, the Court continued to change course on its earlier expansion of standing, emphasizing that the federal law of standing was based not primarily on functional concerns about the adversary presentation of the dispute, as indicated in *Baker* and *Flast*, but separation of powers, *see Allen v. Wright*, 468 U.S. 737, 752 (1984), and federalism, *see Los Angeles v. Lyons*, 461 U.S. 102, 112 (1983).

**E.  *Lujan* and "Injury in Fact" to Date**

¶ 54 In 1992, with an opinion written by Justice Scalia, the Supreme Court dramatically altered the law of standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), when the Court held for the first time that plaintiffs had no standing to bring suit under a congressional statute authorizing suit because they lacked "injury in fact." The plaintiffs had sued under the Endangered Species Act (ESA). Section 7 of the ESA requires the Secretary of the Interior to consult with other agencies when agency projects threaten the existence of endangered plants and animals. 16 U.S.C. § 1536(a)(2) (2018). The Interior Department had originally construed that statute to apply to actions within the United States, on the high seas, or in foreign nations. *Lujan*, 504 U.S. at 558. The agency reexamined its position and ultimately issued a new regulation interpreting the statute to require consultation only for actions taken

in the United States or on the high seas, not in foreign nations. *Id.* at 558–59. The plaintiffs, wildlife conservation organizations, challenged the new regulation as wrongly interpreting the statute.

¶ 55      In its decision, the Court announced the test for standing that remains the law of standing at the federal level today, that as an "irreducible constitutional minimum" standing requires three elements:

> First, the plaintiff must have suffered an "injury in fact"—
> an invasion of a legally protected interest which is (a)
> concrete and particularized and (b) "actual or imminent,
> not 'conjectural' or 'hypothetical.' " Second, there must be a
> causal connection between the injury and the conduct
> complained of—the injury has to be "fairly . . . trace[able]
> to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not
> before the court." Third, it must be "likely," as opposed to
> merely "speculative," that the injury will be "redressed by
> a favorable decision."

*Id.* at 560–61 (citations omitted) (alterations in original). The Court applied this test and held the plaintiffs had failed to allege adequate "injury in fact." Although the parties had a "cognizable interest" in "the desire to use or observe an animal species," the particular plaintiffs (here, one or more of the organizations' members) would not be " 'directly' affected apart from their ' "special interest" in the subject.' " *Id.* at 563 (citations omitted). The Eighth Circuit Court of Appeals below had nevertheless held there was standing based upon the ESA's "citizen-suit" provision granting "any person" a right to sue to enforce the statute. *Id.* at 571–72 (quoting 16 U.S.C.

§ 1540(g)). The Supreme Court rejected this rationale, however, concluding that the interest conferred by the statute was merely a "conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' ," *id.* at 573, and that it was merely a "generalized grievance," *id.* at 575. The Court summarized the generalized grievance caselaw including *Frothingham*, *Levitt*, *Richardson*, *Schlesinger*, and *Valley Forge*[34] and applied the prohibition for the first time to bar standing for a claim that arose not under the Constitution, like every generalized grievance case before, but under a statutory cause of action created by Congress. Recognizing this novel path, the Court noted that "there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right," and to do so "would be discarding . . . one of the essential elements that identifies those 'Cases' and 'Controversies' that are the business of the courts. . . ." *Id.* at 576. Thus, on the basis of the Case or Controversy requirement, the Court held plaintiffs lacked standing to sue in an action to vindicate the public interest in the effective enforcement of laws even where Congress expressly conferred standing to sue.

¶ 56        Criticism of *Lujan* and the injury-in-fact requirement more broadly has been widespread. First, it has been criticized most harshly for its inconsistency with the original meaning of the case or controversy requirement of Article III and, in particular, the long history in England and the United States of public actions

---

[34] Although, notably, *Flast* was not discussed.

brought by private plaintiffs, including those authorized under a statute, as summarized above. *See generally* Sunstein, *Standing After* Lujan, 91 Mich. L. Rev. 163; Gene R. Nichol, Jr., *Justice Scalia, Standing, and Public Law Litigation*, 42 Duke L.J. 1141, 1151–53 (1993). Second, the injury-in-fact test, which was introduced in *Data Processing* to expand access to the courts, was, according to the critics, perversely used instead to foreclose access to the judiciary under many statutory "citizen-action" provisions. Third, critics argue that despite its occasional statements to the contrary, in turning to "injury in fact," the Court has undermined the separation of powers by invading the power of the legislature to create rights. *See* Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275 at 320–-21. Most strikingly, critics argue that the rule in *Lujan* could be applied to limit even indisputably private rights of action created by statute.[35] Fifth, despite reflecting an attempt to objectify the law and separate standing analysis from a decision on the merits, the critics argue that the injury-in-fact test essentially imports assessment of the merits of the claim into the analysis *sub rosa*. Nichol, *Rethinking Standing*, 72 Cal. L. Rev. at 78. Finally, the critics argue that original concerns motivating standing doctrine—ensuring sufficient "concrete adverseness" to ensure efficient

---

[35] *See Spokeo*, 136 S. Ct. at 1549, 194 L. Ed. 2d at 635 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.").

resolution of disputes—does not necessitate and is arguably impaired by the injury in fact requirement.[36]

¶ 57     In summary, the very notion of a standing requirement under Article III only arose in the twentieth century. For most of our nation's history, federal law permitted standing for private citizens in public actions even in the absence of any particularized injury requirement. For most of the twentieth century, standing existed where there was invasion of a legal right under the common law, a statute, or the Constitution. The Supreme Court long emphasized a functional and pragmatic approach to the question of standing, focused on "concrete adverseness," generally limiting this concern to constitutional questions, and significantly expanded the categories of claims that could support standing. However, that expansion was reversed, first in the context of taxpayer and citizen suits and, later with the adoption of an "injury in fact" requirement, which has been increasingly used to constrain access to federal courts even where a statute creates a right to sue. Ultimately the Court adopted a restrictive interpretation of injury-in-fact that applied its substantially tightened requirements for standing to attack the constitutionality of

---

[36] Notably, the Supreme Court has largely jettisoned *Baker*'s concrete adverseness rationale. *See Lewis v. Casey*, 518 U.S. 343, 353 n.3 (1996) (noting standing doctrine "has a separation of powers component, which keeps courts within certain traditional bounds vis-à-vis the other branches, concrete adverseness or not. That is where the 'actual injury' requirement comes from").

acts of the other branches based on taxpayer or citizen standing beyond that context to rights actually created by Congress.

### F. Standing Under North Carolina Law

¶ 58      We must now determine whether our North Carolina Constitution, specifically the "judicial power" provisions of Article IV, §§ 1 and 2, imposes a requirement for "standing," as well as a requirement for "injury-in-fact," to bring suit under a cause of action which the General Assembly has expressly created. As an initial matter, we have held that our Constitution, unlike the federal constitution, "is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people . . . ." *McIntyre v. Clarkson*, 254 N.C. 510, 515 (1961) (quoting *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112 (1958)). Judicial power under the state constitution is, therefore, plenary, and "[e]xcept as expressly limited by the constitution, the inherent power of the judicial branch of government continues."[37] *Beard v. North Carolina State Bar*, 320 N.C. 126, 129 (1987); *see generally State v. Lewis*, 142 N.C. 626 (1906). While the federal constitution limits the federal "judicial Power" to certain "Cases" and "Controversies." U.S. Const. Art. III, § 2, our Constitution, in contrast, has no such case or controversy limitation to the "judicial

---

[37] Other states have recognized the "plenary" nature of their judicial power under state constitutions. *See, e.g., Couey*, 357 Or. at 502, 355 P.3d at 891; *Borrego v. Territory*, 8 N.M. 446, 495 (1896) ("judicial power . . . is thus vested in plenary terms"); *Floyd v. Quinn*, 24 R.I. 147, 149 (1902) ("[T]he vesting of the judicial power is plenary and exclusive.").

power." Because the federal concept of standing is textually grounded in terms which are not present in the North Carolina Constitution, we see that the framers of the North Carolina Constitution did not, by their plain words, incorporate the same federal standing requirements. *See Goldston v. State*, 316 N.C. 26, 35 (2006) (holding North Carolina standing doctrine is "not coincident with federal standing doctrine"). Thus, any limitation on the judicial power in the North Carolina Constitution must inhere in the phrase "judicial power" itself.

### 1. Does the North Carolina Constitution Impose an "Injury-in-Fact" Requirement Under the "Judicial Power" Provision?

As noted, throughout the nineteenth century, the words "judicial power" in our Constitution imposed no limitation on standing. Since 1776, North Carolina law contemplated that the writ of mandamus and an action in the nature of the writ of *quo warranto* were available without any showing of a personal stake in the litigation, continuing a legacy that originated in the earliest days of the common law. Against this backdrop, we conclude that neither the framers of the 1776 Constitution, which recognized a judicial power to be kept "forever separate and distinct," nor of the 1868 Constitution, which originated our present "judicial power" in its own Article, imposed a requirement of particular injury beyond a legal right at common law, by statute, or under the constitution itself. The only case we have identified in the nineteenth century imposing a standing-type justiciability doctrine as a constitutional requirement was the prohibition against collusive suits. *See Blake v.*

*Askew*, 76 N.C. at 326 ("If they were ever valid in this State, feigned issues are abolished by the Constitution, Art. 4, § 1.").

¶ 60          Concerns about standing under North Carolina law arose in the context of suits to enjoin legislation for violating the constitution; rather than in preventing parties from getting in the courthouse door, these concerns addressed what arguments parties may lodge once there. In *St. George v. Hardie*, 147 N.C. 88 (1908), for instance, a licensed boat pilot for hire, who was licensed by a licensing board regulating pilotage on the Cape Fear River, sought to pilot a boat into the river and was denied by the defendant, the captain of the vessel, who piloted it into and out of the river himself. The plaintiff sued for the fee and the defendant, on appeal, challenged the validity of the statute authorizing the licensing board alleging that it created a monopoly in violation of the emoluments and monopolies clauses of the North Carolina Constitution by limiting the number of pilots. This Court held the defendant could not present this argument because he did not lose any right of selection of pilot as he intended to pilot his own ship. "Nor will a court listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who has, therefore, no interest in defeating it." *Id.* at 97. Reasoning that the plaintiff was thus advancing the right of third parties, we noted that, as a principle of constitutional avoidance, we will pass upon the constitutionality of a legislative act "only in respect to those particulars, and as against those persons whose rights are thus

affected[;] . . . it is only where some person attempts to resist its operation and calls in the aid of its judicial power, to pronounce it void, as to him, his property, his rights, that the objection of unconstitutionality can be presented and sustained." *Id.* at 98 (quoting *In re Wellington*, 33 Mass. (16 Pick.) 87, 96 (1834)). *St. George* might best be understood as an application of the principle of *jus tertii*, prohibiting a party from raising the rights of third parties. *See Holmes v. Godwin*, 69 N.C. 467, 470 (1873) ("*In general, jus tertii* cannot be set up as a defence by the defendant, unless he can in some way connect himself with the third party.").

¶ 61        We soon extended this principle to recognize that, in exercise of the equitable judicial power, a party was not entitled to injunctive relief as a matter of *substantive* law unless he would be irreparably harmed. *See Newman v. Watkins*, 208 N.C. 675, 678 (1935) ("The plaintiffs sought in a court of equity to restrain an election. It was freely conceded upon the argument that unless the statute in question is unconstitutional, the plaintiffs were not entitled to the relief sought."). This Court quoted a treatise which itself cited *Frothingham* for the principle that "[t]he party who invokes the power (of a court to declare an act of the legislature unconstitutional) must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.* at 676–77 (quoting Willoughby, *Willoughby on the Constitution*

*of the United States* (2d ed.) § 13, p. 20).[38] We have consistently required a showing

of direct injury in injunctive suits, emphasizing that this requirement is limited to

parties seeking injunctive relief declaring laws unconstitutional. *See Leonard v.*

*Maxwell*, 216 N.C. 89, 97 (1939), ("If others have been aggrieved [by provisions for

which plaintiff did not allege hurt], it suffices to say the plaintiff can speak only for

himself. I*n matters of constitutional challenge*, he is not his brother's keeper."

(emphasis added) (citing *Newman v. Watkins*, 208 N.C. 675 (1935)); *Yarborough v.*

*North Carolina Park Comm'n*, 196 N.C. 284, 288 (1928) ("A party who is not

personally injured by a statute is not permitted to assail its validity; if he is not

injured, he should not complain because another may be hurt."). In subsequent cases

we have required a plaintiff to show direct injury in the two modern contexts in which

injunctive relief remedied by declaring a law unconstitutional ordinarily arises—

actions under the Uniform Declaratory Judgment Act and challenges to zoning

ordinances. *See, e.g., American Equitable Assur. Co. of N.Y. v. Gold*, 248 N.C. 288

---

[38] This Court has also cited *Ex parte Levitt* for a near-identical proposition. *See Turner v. City of Reidsville*, 224 N.C. 42, 47 (1944) ("It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." (quoting *Ex parte Levitt*, 302 U.S. 633 (1937))). Although we have cited these federal cases for this proposition in the past, it does not follow that the requirement for direct injury in injunctive suits in North Carolina is coterminous with these federal analogues. *See Goldston*, 361 N.C. at 35; *accord Nicholson v. State Ed. Assistance Authority*, 275 N.C. 439, 448 (1969) ("A taxpayer, as such, may challenge, by suit for injunction, the constitutionality of a tax levied, or proposed to be levied, upon him for an illegal or unauthorized purpose.").

(1958) (plaintiffs adequately alleged personal, direct injury under Uniform Declaratory Judgment Act); *Fox v. Board of Comm'rs of Durham County*, 244 N.C. 497 (1956) (no injury alleged in challenge zoning ordinance affecting county only as residents and taxpayers of county).

¶ 62        The "direct injury" required in this context could be, but is not necessarily limited to, "deprivation of a constitutionally guaranteed personal right or an invasion of his property rights." *State ex rel. Summrell v. Carolina-Virginia Racing Ass'n*, 239 N.C. 591, 594 (1954); *see also Canteen Services v. Johnson, Comm'r of Revenue*, 256 N.C. 155, 166 (1962) (holding only persons "who have been injuriously affected . . . in their persons, property or constitutional rights" may challenge constitutionality of a statute). Notably, unlike in federal court, taxpayer status has long served as a basis for challenges alleging the unconstitutional or illegal disbursement of tax funds. *See Goldston v. State*, 361 N.C. at 30–31 (citing *Stratford v. City of Greensboro*, 124 N.C. 110, 111–112 (1899)). For example, we considered the standing of taxpayers to challenge the validity of a statute in *Stanley v. Department of Conservation and Development*, 284 N.C. 15 (1973).  There, we held that the taxpayers were injured by a statute that exempted property from taxation, because this "increases the burden imposed upon all other taxable property."  *Stanley*, 284 N.C. at 29.

¶ 63        We have not yet addressed whether the requirement of a "direct injury" or, in other words, that a person be "adversely affected" by a statute, which we have applied

as a substantive requirement to entitle a plaintiff to injunctive relief, is also a constitutional requirement under the "judicial power" of Article IV, § 2 of our Constitution. This requirement is, however, founded on a longstanding concern that "[t]he courts never anticipate a question of constitutional law in advance of the necessity of deciding it." *Wood v. Braswell*, 192 N.C. 588, 589 (1926). Notably in *Wood*, Chief Justice Stacy in a concurring opinion did locate this rule, along with our avoidance of venturing advisory opinions on constitutional questions, in Article IV, § 2, reasoning that "it is only in cases calling for the exercise of judicial power that the courts may render harmless invalid acts of the Legislature." *Id.* at 590 (Stacy, C.J., concurring). The majority, however, did not go that far, implicitly reserving the question of whether this principle arises directly from the judicial power or as a prudential principle of judicial self-restraint.

¶ 64      We have since clarified that the rule requiring direct injury to challenge the constitutionality of a statute is based on the rationale "that only one with a genuine grievance, one personally injured by a statute, can be trusted to battle the issue." *Stanley v. Department of Conservation and Development*, 284 N.C. 15, 28 (1973). In *Stanley*, citing *Flast* approvingly for the rationale underpinning federal standing announced in *Baker*, we held

> [t]he "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues

> upon which the court so largely depends for illumination of
> difficult constitutional questions."

*Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)). As in the case "in which there is

no actual antagonistic interest between the parties, or where it appears that the

parties are as one in interest and desire the same relief," *Bizzell*, 248 N.C. at 295

(citations omitted), we held that "[w]henever it appears that no genuine controversy

between the parties exists, the Court will dismiss the action ex mero motu." *Stanley*,

284 N.C. at 29 (citing *Bizzell*, 248 N.C. 294).

¶ 65        As we have shown, the general question of standing under the North Carolina

Constitution is motivated by a pragmatic and functional concern with ensuring

"concrete adverseness" that "sharpens the presentation of issues" upon which we

depend, in contrast to the federal standing doctrine which is motivated by both

separation-of-powers and federalism concerns. We hold, therefore, that the "concrete

adverseness" rationale undergirding our standing doctrine is grounded on prudential

principles of self-restraint in exercise of our power of judicial review for

constitutionality, which is itself only an incident of our exercise of the judicial power

to determine the law in particular cases. *See Bayard*, 1 N.C. (Mart.) at 6–7. As this

rationale is directly related to the circumstances under which we assert our power

and duty to declare laws unconstitutional, it applies to challenges necessitating the

resolution of "constitutional questions."[39] *Stanley*, 284 N.C. at 28 (quoting *Flast*, 392 U.S. at 99). Indeed, it is *only* in this context of invoking the "judicial power" to review the constitutionality of legislative and executive acts that the direct injury requirement can be understood. It therefore does not necessarily follow that our requirement for direct injury applies to suits not arising under the constitution, but instead based on common law or statutory right.[40]

¶ 66 We have long held that a plaintiff can maintain an action for infringement of a common law interest irrespective of any "actual" injury that may occur to her. For instance, we have not dismissed trespass actions where there is no allegation of harm beyond the infringement of the legal right. *See Keziah v. Seaboard Air Line R. Co.*, 272 N.C. 299, 311 (1968) ("Any unauthorized entry on land in the actual or constructive possession of another constitutes a trespass, *irrespective of degree of force used or whether actual damages is done.*" (emphasis added)); *see also Hildebrand v.*

---

[39] This is not the only vital question of justiciability we have recognized is a matter of prudential self-restraint. In *In re Peoples*, we recognized that while "[i]n federal the mootness doctrine is grounded primarily in the 'case or controversy' requirement of Article III, Section 2 of the United States Constitution and has been labeled 'jurisdictional' by the United States Supreme Court . . . [i]n state courts [including North Carolina] the exclusion of moot questions from determination is not based on a lack of jurisdiction but rather represents a form of judicial restraint." *In re Peoples*, 296 N.C. 109, 147 (1978).

[40] In the context of an action challenging the constitutionality of a legislative or executive action, we emphasize the requirement for "direct injury" or that the complaining party be "adversely affected" by the action does not incorporate the "injury-in-fact" requirement of federal law. As discussed in detail above, that test arose in 1970 in the context of an interpretation of a provision of the federal APA; whatever its merits as a requirement of the federal constitution, it has no connection to the text or history of our state constitutional provisions or the doctrines we have developed in accordance with them.

*Southern Bell*, 219 N.C. 402, 408 (1941) (holding landowner "is entitled to be protected as to that which is his without regard to its money value"). Indeed, "[s]uch entry entitle[s] the aggrieved party to at least nominal damages." *Keziah*, 272 N.C. at 311. Actions for breach of contract can, in some circumstances, proceed on a theory of nominal damages. *See, e.g., Bryan Builders Supply v. Midyette*, 274 N.C. 264, 271 (1968) (explaining that in a contract action proof of breach alone is enough to avoid judgment of nonsuit). Even in a common law action where actual injury is a necessary element of the claim, such as negligence, the proper disposition for failure to allege actual injury or damages is not dismissal for lack of standing, but dismissal for failure to state a claim upon which relief can be granted. *See, e.g, Hansley v. Jamesville & W.R. Co.*, 115 N.C. 602, 613 (1894) ("Neither negligence without damage nor damage without negligence will constitute any cause of action.").[41] As one commentator has noted, at common law, "[l]egal injuries were conceptualized in terms of the experience of physical injury, but the former was not confused with the latter. It is only in this sense that there could be a notion of *damnum absque injuria*—that is, damage without cognizable legal injury." Winter, *Metaphor*, 40 Stan. L. Rev. at 1397.[42]

---

[41] As the Court of Appeals below noted, "[i]f EMPAC had *slandered* Mr. Forest in its political ad, Mr. Forest would have had standing to seek at least nominal damages for this tort, even though he won the election." *See Comm. to Elect Dan Forest*, 260 N.C. App. at 7 (citing *Wolfe v. Montgomery Ward*, 211 N.C. 295, 296 (1937)).

[42] One possible exception is the private action for common law public nuisance, but while our courts have sometimes characterized the requirement of a showing of special damages or invasion of a right not considered merged in the general public right in such an action as a requirement for "standing," *see, e.g., Neuse River Foundation, Inc. v. Smithfield*

¶ 67 We have also long held that where the Legislature has created a statutory cause of action, so long as the plaintiff falls in the class of persons on which the statute confers the right, the courts will hear her claim. As we previously noted, since the nineteenth century, our Court has permitted citizens to bring citizen-suits alleging no personal injury or interest besides the statutory grant under statutory analogues to the common-law prerogative writs, such as the action in the nature of a writ *quo warranto. See Hall*, 111 N.C. at 371. We continue to recognize the Legislature's power to create such 'standingless' causes of action based upon purely 'public' rights. *State ex rel. Summrell v. Carolina-Virginia Racing Association*, 239 N.C. 591 (1954), authored by Justice (later, Chief Justice) William Bobbitt for the Court, is most instructive.

¶ 68 In *Summrell*, a plaintiff who was a resident of Currituck County sued "to perpetually enjoin, as a nuisance as defined by N.C.G.S. § 19-1, the defendant's maintenance and use of certain premises, buildings, fixtures and machines, for the

---

*Foods, Inc.*, 155 N.C. App. 110, 115 (2002), dismissal for lack of subject-matter jurisdiction in such cases is based not on a constitutional requirement for standing or injury, but on the absence of any possible damages to be recovered. *See Hampton v. Pulp Co.*, 223 N.C. 535, 544 (1943) ("The real reason on which the rule denying individual recovery of damages [for public nuisances absent special damages or invasion of some right not considered merged in the general public right] is based—and the only one on which the policy it reflects could be justified—is that a purely public right is of such a nature that ordinarily an interference with it produces no appreciable or substantial damage."). In such cases, the absence of special damages or infringement of a right precludes establishment of the private cause of action at all, but as discussed below, a public action for abatement of public nuisance, including one maintained by any "private citizen of the county," is still available. *See* N.C.G.S. § 19-2.1 (2019).

purpose of gambling." *Id.* at 591. The defendant Racing Association was a private

corporation granted a franchise as a result of an act of the General Assembly.

Pursuant to that law, an election was held at which a majority of the voters

participating voted in favor of a countywide Racing Commission. *Id.* To enforce its

prohibition against the nuisances listed in § 19-1, the General Assembly chose to

create a civil action at N.C.G.S. § 19-2, under which the plaintiff sued as relator,

which provided as follows:

> "Any citizen of the county may maintain a civil action in
> the name of the State of North Carolina upon the relation
> of such . . . citizen, to perpetually enjoin said nuisance, the
> person or persons conducting or maintaining the same, and
> the owner or agent of the building or ground upon which
> said nuisance exists."

*Id.* at 594 (quoting N.C.G.S. § 19-2 (1965)). The action created by the General

Assembly was plainly a "public action" as we discussed above—a "case[ ] in which a

plaintiff, in some fashion or other, asserts the public's interest rather than just his

own—in an attempt to challenge the actions of the government or a private party."

Gene R. Nichol, Jr., *The Impossibility of* Lujan*'s Project*, 11 Duke Envtl. L. & Pol'y F.

193, 194 (2001). The plaintiff's interest, even as recognized by the statute, was no

different than that of any other "citizen" of his county.[43] It certainly could not be

---

[43] It is worth noting, though not strictly necessary to our present purposes, that the constitutionality of the act authorizing the commission was implicitly at issue in the claim because, if the act was valid, the plaintiff could not prevail on his substantive nuisance claim. Thus, this Court recognized, in this instance at least, that a statutory cause of action could

contended to be "concrete" or "particularized." *Lujan*, 504 U.S. at 560. Nevertheless, this Court reversed the trial court's decision that it lacked "legal authority" to pass upon the action, holding that "the plaintiff's action is not grounded on general equitable principles *but on the express authority of [the statute]*, and he is entitled to injunctive relief if he can prove his allegations that the defendant is conducting and maintaining a gambling establishment." *Summrell*, 239 N.C. at 594 (emphasis added).

¶ 69    Nor was *Summrell* the last time this Court recognized the Legislature's power to create causes of action and permit a plaintiff to recover in the absence of a traditional injury. In *Bumpers v. Community Bank*, 367 N.C. 81, 88 (2013), for instance, we held the General Assembly had authority to prohibit unfair and deceptive trade practices and to create a private cause of action in favor of a class of individuals to enforce this prohibition. In order to come within the class of persons protected by the statute the plaintiff must have been "injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter," N.C.G.S. § 75-16 (2011); however, "[t]his statute is broader and covers more than traditional common law proscriptions on tortious conduct, though fraud

---

provide a basis for judicial review of the constitutionality of a legislative act where there was effectively no citizen standing, on the basis that the action was not grounded on equity, but statute. This bolsters our conclusion that standing is a prudential, not purely constitutional, restraint on this Court's exercise of the "judicial power."

and deceit tend to be included within its ambit." *Bumpers*, 367 N.C. at 88. Thus, North Carolina's Unfair and Deceptive Trade Practices Act expanded the injury for which a plaintiff could recover beyond the common law and the question of the plaintiff's standing was not even raised.

¶ 70            In *Addison v. Britt*, 83 N.C. App. 418 (1986), a case involving the federal Truth in Lending Act, our Court of Appeals concluded that "[o]nce a violation of an actionable portion of the [Truth in Lending Act] is established, the debtor is entitled to recover statutory damages [and that b]ecause the purpose of that section is to encourage private enforcement of the Act, *proof of actual damages is unnecessary*." *Id.* at 421 (emphasis added). Thus, the civil action under the Truth in Lending Act reflects a "private attorney general" action, in the sense that Congress, to promote the purposes of the Act, has empowered private individuals to sue to vindicate the public interest and to recover based on the statutory damage formula, regardless of the damages actually accumulated. Furthermore, the Act did not require "that the debtors have been misled or deceived in any way." *Id.* Thus, the Act authorized "any person [who] is liable to such [creditor failing to comply with the Act]" to recover under the Act, irrespective of actual injury resulting from infringement of the Act. *See* 15 U.S.C. § 1640(a) (1982).

¶ 71            In summary, our courts have recognized the broad authority of the legislature to create causes of action, such as "citizen-suits" and "private attorney general

actions," even where personal, factual injury did not previously exist, in order to vindicate the public interest. In such cases, the relevant questions are only whether the plaintiff has shown a relevant statute confers a cause of action and whether the plaintiff satisfies the requirements to bring a claim under the statute. There is no further constitutional requirement because the issue does not implicate the concerns that motivate our standing doctrine. *See, e.g., Stanley*, 284 N.C. at 28. The existence of the legal right is enough.

¶ 72     Having surveyed the relevant English, American, and North Carolina law of standing, we are finally in a position to determine whether, as EMPAC and the dissent below argue, the North Carolina Constitution imposes an "injury-in-fact" requirement, as under the federal constitution. While our Court of Appeals has previously come to that conclusion, which was followed by numerous panels of that court, *see, e.g., Neuse River Foundation, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113–15 (2002) (holding North Carolina law requires "injury in fact" for standing and applying *Lujan*), we are not bound by those decisions and conclude our Constitution does not include such a requirement.

¶ 73     First, the federal injury-in-fact requirement has no place in the text or history of our Constitution. Our Constitution includes no case-or-controversy requirement, upon which the federal injury-in-fact requirement is based. Rather, as discussed above, the "judicial power" provision of our Constitution imposes no particular

requirement regarding "standing" at all. Rather, as a rule of prudential self-restraint, we have held that, in order to assure the requisite "concrete adverseness" to address "difficult constitutional questions," we have required a plaintiff to allege "direct injury" to invoke the judicial power to pass on the constitutionality of a legislative or executive act. *See Stanley*, 284 N.C. at 28. This standing principle arises as an incident of our power and duty to determine whether executive or legislative acts violate the constitution in the resolution of actual controversies. However, where a purely statutory or common law right is at issue, this rationale is not implicated, and a showing of direct injury beyond the impairment of the common law or statutory right is not required.

Second, the injury-in-fact standard is inconsistent with the caselaw of this Court. To be sure, our own decisions have not always maintained these distinctions with exactitude—or avoided the doctrinal encumbrances which have attached to the "slogans and litanies" of standing decisions as barnacles to the hull. Nichol, *Rethinking Standing*, 72 Cal. L. Rev. at 71. *Dunn v. Pate*, 334 N.C. 115 (1993), provides a particularly instructive example. In that case, we held defendants seeking to avoid having a 1962 deed set aside for failure to comply with a statute in effect at the time, which required the clerk of court to make a private examination of a wife whenever she and her husband entered into a contract to ensure the conveyance was neither unreasonable nor injurious to the wife, had standing to challenge the statute

as unconstitutional when the conveyance at issue apparently did not comply with the allegedly discriminatory (and since-repealed) statutory requirement. *Id.* at 117. On the way to holding the defendants in question had standing to attack the constitutionality of the private examination statute, however, we partially overruled a prior Court of Appeals decision while noting the court "correctly stated that the petitioner 'must allege she has sustained an "injury in fact" as a direct result of the statute to have standing.' " *Id.* at 119 (quoting *Murphy v. Davis*, 61 N.C. App. 597, 600, *cert. denied & appeal dismissed,* 309 N.C. 192 (1983)). The Court of Appeals decision, *Murphy*, which we had approved of in this respect had cited Article III, § 1 of the U.S. Constitution, *Baker*, and a case of this Court that itself precisely quoted the standard we discussed above in *Stanley* that was derived from *Baker* via *Flast*. However, the proposition in *Murphy* for which these sources were cited was entirely different: that "Petitioner must allege she has sustained an 'injury in fact' as a direct result of the statute to have standing to challenge the statute as violating either the federal or the North Carolina constitutions." *Murphy*, 61 N.C. App. at 600. Notably, *none* of the sources cited in *Murphy* included the language "injury in fact" and, as discussed in detail above, stand for entirely different propositions. Moreover, this Court in *Dunn* did not itself rely on the federal "injury in fact" standard—throughout the opinion we cited North Carolina caselaw and nowhere cited *Lujan* or *Data Processing*, from which that language originates. Instead, we relied upon the familiar

principle that, in a challenge to the constitutionality of a statute, a party has standing if they have been "injuriously affected . . . in their . . . property . . . ." *See Dunn*, 334 N.C. at 119 (quoting *Canteen Service*, 256 N.C. at 166). Nevertheless, the Court of Appeals and litigants have taken this apparent approval of an unsupported reference to "injury in fact" in *Dunn* and concluded we intended to incorporate federal standing requirements into North Carolina law. *See, e.g., Neuse River Foundation*, 155 N.C. App. at 114 ("Standing most often turns on whether the party has alleged 'injury in fact' in light of the applicable statutes or caselaw." (citing, inter alia, *Dunn*, 334 N.C. at 119)); *Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 390–92 (2005) (applying *Neuse River Foundation*'s adoption of *Lujan*'s standing requirements to hold plaintiff under UDTPA had not shown "injury in fact" to support standing). We conclude otherwise.[44]

¶ 75    The Court of Appeals' misapplication of our standing requirements in *Neuse River Foundation* was also based on our opinion in *Empire Power Co. v. North Carolina Department of Environment, Health and Natural Resources (DEHNR)*, 337 N.C. 569 (1994). This case is particularly instructive, because it demonstrates how words can assume unintended meanings in the arena of standing. *Empire Power Co.* involved a challenge brought under the North Carolina Administrative Procedure Act

---

[44] To the extent the Court of Appeals' opinion in *Neuse River Foundation, Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110 (2002), is at odds with this opinion, we disavow it.

(NCAPA), N.C.G.S. §§ 150B-1, *et seq.* (1991), and the Air Pollution Control Act (APCA), N.C.G.S. §§ 143-215.105, *et seq.* (1993), appealing a decision of DEHNR granting an air pollution control permit to a power company to the Office of Administrative Hearings (OAH). *Empire Power Co.*, 337 N.C. at 572. The petitioner alleged DEHNR had violated its statutory duty to reduce air pollution under the APCA by giving the power company a permit without addressing comments filed by another power company. *Id.* at 572. The Court of Appeals concluded, and the power company and DEHNR both argued before this Court, that the petitioner was not an "aggrieved person" within the meaning of the NCAPA because the NCAPA cannot confer a right to an administrative hearing in the OAH and that such a right must be set forth in the organic statute at issue (there, the APCA). *Id.* at 574. This Court reversed, holding that the petitioner had shown that he was a "person aggrieved" under the NCAPA and thus "entitled to an administrative hearing to determine [his] rights, duties, or privileges." *Id.* at 588 (quoting N.C.G.S. § 150B-23(a) (1991)). We noted that, under the NCAPA, " 'Person aggrieved' means any person or group of persons of common interest directly or indirectly affected substantially in his or its person, property, or employment, by an administrative decision," *Id.* at 588 (quoting N.C.G.S. § 150B-2(6)), and held that the petitioner had established he was a "person aggrieved" because he lived downwind of the permitted station and "alleged *sufficient injury in fact to interests within the zone of those to be protected* and regulated by the

statute [(the APCA)], and rules and standards promulgated thereto, the substantive and procedural requirements of which he asserts the agency violated when it issued the permit." *Id.* at 589 (emphasis added). This passing use of the phrase "injury in fact" was not in reference to any requirement of standing under the North Carolina Constitution, but whether the plaintiff had injuries to interests that fall within the zone of interests protected by the underlying statute such that the plaintiff was in the class of those "persons aggrieved" for whom the NCAPA conferred a right to an administrative decision.

### 2. *Does the Remedy Clause of the North Carolina Constitution Impose an "Injury-in-Fact" Requirement?*

¶ 76 Finally, it might nevertheless be argued that the remedy clause of the North Carolina Constitution imposes a factual injury requirement for standing. In this case, the Court of Appeals, including both the majority and the dissent below, relied on our statement in *Mangum v. Raleigh Board of Adjustment*, 362 N.C. 640 (2008), to hold the North Carolina Constitution imposes an injury in fact requirement before a plaintiff may have standing.[45] *See Comm. to Elect Dan Forest*, 260 N.C. App. at 6

---

[45] As an initial matter, we note that we did not impose a constitutional requirement of "injury-in-fact" in *Mangum*; rather, we held only that, where a petitioner files an action in the nature of certiorari to challenge a quasi-judicial decision under a zoning ordinance based on standing conferred under 160A-393(d)(2) (2019) (recodified at N.C.G.S. § 160D-1402(c)(2)), the petitioner must have alleged "special damages" to maintain the action and the allegations of the petitioner there were sufficient in that regard. *See Mangum*, 362 N.C. at 644; *accord* N.C.G.S. § 160D-1402(c)(2) (Supp. 2 2020) ("The following persons shall have standing to file a petition under this section: . . . Any other person who will suffer special damages as the result of the decision being appealed."). The requirement for special damages to have

("According to our Supreme Court, '[t]he North Carolina Constitution confers standing on those who suffer harm[,]' and that one must have suffered some 'injury in fact' to have standing to sue." (citing first *Mangum*, 362 N.C. at 642; and then *Dunn*, 334 N.C. at 119); *Id.* at 13 (McGee, C.J., dissenting) (" 'As a general matter, the North Carolina Constitution confers standing on *those who suffer harm*[.]' Therefore, the North Carolina Constitution does *not* confer standing on those who *have not suffered harm*." (emphasis in original) (citations omitted)). In *Mangum*, we stated "The North Carolina Constitution confers standing on those who suffer harm: 'All courts shall be open; [and] every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law . . . ." *Mangum*, 362 N.C. at 642 (quoting N.C. Const. Art. I, § 18). While our statement in *Mangum* was an adequate summary of the remedy clause's effect on questions of standing—that the provision "confers standing on those who suffer harm"—it does not follow that the those who do not suffer "harm" lack "standing." In terms of logic, "harm" is a sufficient but not a necessary condition for "standing." Much recent difficulty has arisen because of our use of the term "harm." Of course, the remedy clause does not speak in terms of "harm" but "injury," and we turn to the text and history to discern its meaning.

---

standing to sue in such cases arises from the requirements of the statute which creates and confers the cause of action on certain persons, not the constitution.

Article I, section 18 of the North Carolina Constitution provides:

> All courts shall be open; *every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law*; and right and justice shall be administered without favor, denial, or delay.

N.C. Const. art. I, § 18 (emphasis added). This provision has ancient roots in English and American law. Our most contemporary treatise on the North Carolina Constitution identifies the protean origins of Article I, § 18 as a principle in Magna Carta: " '*Nulli vendemus nulli negabimus aut differemus rectum vel justitiam.*' ('To no one will we sell, to no one will we deny or delay right or justice.')" John V. Orth and Paul Martin Newby, *The North Carolina State Constitution* 65 (2d ed. 2013) (quoting Magna Carta, § 40 (1215)). The second clause of the open courts provision, commonly termed a "remedy clause," stemmed not from the text of Magna Carta, § 40 itself, but from Lord Edward Coke's influential commentaries on the provision in his *Institutes of the Laws of England. See* Orth and Newby, *The North Carolina State Constitution* 66 (noting that Lord Coke's commentaries pointed out that "[o]pen courts were not enough . . . ; they had to be righting wrongs and doing justice"); *see generally* David Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. 1197 (1992) (describing the origin, history, and interpretation of remedy clauses). Lord Coke reasoned that, by implication, Magna Carta necessitated more than merely "open" courts: "And therefore every Subject of the Realm, for injury done to him in *bonis*, *terries*, *vel persona* [goods, lands, or person] . . . may take his remedy by the course of

the Law . . . ." Orth and Newby, *The North Carolina State Constitution* 66 (quoting Edward Coke, *Institutes of the Laws of England* (London: Society of Stationers, 1641), vol. 2, 55–56).

¶ 78 Prior to *Mangum*, we had never construed this provision to implicate standing. Rather, we have focused on whether the legislature may restrain the remedies available in certain ways. For instance, we have held the remedy clause of the open courts provision permitted the legislature to abolish punitive damages for a libeled plaintiff if a timely retraction was printed, however, we stated in dicta that abolishing compensatory damages would have violated the clause. *Osborn v. Leach*, 135 N.C. 628, 639–40 (1904). Moreover, we have held the legislature does not violate the clause by instituting a statute of repose, because the "the remedy constitutionally guaranteed must be one that is legally cognizable," and "[t]he legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not." *Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 444 (1983).[46]

¶ 79 How the remedy clause interacts with standing presents another question. This question turns not on what "remedy" is guaranteed, but what the term "injury" means in the phrase so as to entitle a plaintiff to a remedy. Although the provision in its present incarnation was first incorporated into the Declaration of Rights as Article

---

[46] In *Lamb*, we expressly reserved the question whether "the legislature may constitutionally abolish altogether a common law cause of action." *Id.* at 444.

I, § 35 at the 1868 Constitutional Convention, it was not discussed in the records of Convention. *See Journal of the Constitutional Convention of the State of North Carolina* (Raleigh, Joseph W. Holden, 1868). While we cannot infer the intent of the framers from this silent record, commentators have noted "the enactment of these provisions was generally motivated by concerns that the legislature, and sometimes even the courts, might block access to justice. Thus, rather than restricting legislative conferrals [of standing], if anything, they suggest a constitutional mood favorable to broad access to the courts." James W. Doggett, *"Trickle Down" Constitutional Interpretation: Should Federal Limits on Legislative Conferral of Standing be Imported into State Constitutional Law?*, 108 Col. L. Rev. 839, 878 (2008) (note) (footnotes omitted). Acknowledging this background, we nevertheless must interpret our open courts provision based on contemporaneous understandings and the common law background, which, as we have seen, continued to inform lawmakers well into the nineteenth century.

¶ 80    The concept of "injury" to which Lord Coke referred in his *Institutes* and which pervaded the common law of England and in America is entirely distinct from the concept of "injury in fact" in modern caselaw, encompassing "injuries" which did not include factual harm. For instance, in his own *Commentaries*, Blackstone recognized the writs of mandamus and prohibition, discussed in detail above, "redressed the legal injuries of 'refusal or neglect of justice' and 'encroachment of jurisdiction,'

respectively." Winter, *Metaphor*, 40 Stan. L. Rev. at 1397 (quoting 3 William

Blackstone, *Commentaries* \*111).[47]

> The term 'injury' referred to 'any infringement of the rights of another . . . for which an action lies at law.' Legal injuries were conceptualized in terms of the experience of physical injury, but the former was not confused with the latter. It is only in this sense that there could be a notion of *damnum absque injuria*—that is, damage without cognizable legal injury.

*Id.* (footnotes omitted) (quoting 1 W. Jowitt, *The Dictionary of English Law* 977 (2d

ed. 1977)). As Professor Hessick has noted,

> [f]actual injury (damnum) alone was not sufficient to warrant judicial intervention; rather, a person could maintain a cause of action only if he suffered a legal injury, that is, the violation of a legal right (injuria). A factual harm without a legal injury was *damnum absque injuria*, and provided no basis for relief.

Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. at 280–81

(citing 1 Theodore Sedgwick, *A Treatise on the Measure of Damages* § 32, at 28 (Arthur

G. Sedgwick and Joseph H. Beale eds., 9th ed. 1920)). However, while *damnum*

*absque injuria* (factual harm without legal injury) was insufficient at common law,

*injuria sine damno* (legal injury without factual harm) sufficed. As Professor Hessick

recounts, the seminal case of *Ashby v. White*, 2 Ld. Raym. 938, 92 Eng. Rep. 126,

---

[47] As Professor Winter notes, "if Blackstone's definitions of these 'injuries' sound strange to modern ears, it is because today's jurisprudence treats 'injury-in-fact' in literalist terms. But the common law usage of the term 'injury' was plainly metaphoric." *Id.* at 1397.

(1702) (Holt, C.J., dissenting), rev'd, 3 Salk. 17, 91 Eng. Rep. 665, would ultimately

resolve this question:

> The distinction between actions on for trespass [(which did not require factual harm)] and actions on the case [(which initially did)] began to collapse in the early eighteenth century as courts became resistant to denying relief to plaintiffs whose rights had been violated but who could not demonstrate harm. In the English case *Ashby v. White*, Chief Justice Holt rejected the notion that a plaintiff could not maintain an action on the case arising from the violation of a right if he suffered no harm. He explained that "[i]f the plaintiff has a right, he must of necessity have a means to vindicate and maintain it, and a remedy if he is injured in the exercise or enjoyment of it; and indeed it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal." Responding to the argument that an action on the case was "not maintainable because here is no hurt or damage to the plaintiff," Chief Justice Holt argued that "surely every injury imports a damage, though it does not cost the party one farthing, and it is impossible to prove the contrary; for a damage is not merely pecuniary, but an injury imports a damage, when a man is thereby hindered of his right." Regardless of the type of action, the violation of the right was what mattered.

Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. at 281–82

(footnotes omitted).[48] The validity of Justice Holt's views in *Ashby* has been affirmed

by this Court as a matter of North Carolina common law. *See, e.g., Eller v. Carolina*

---

[48] "Although Chief Justice Holt's opinion was in dissent, his judgment prevailed on appeal in the House of Lords. By the nineteenth century, both England and the United States regarded Chief Justice Holt's view as correctly stating the law." Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. at 282–83 (footnotes omitted).

*& W Ry. Co.*, 140 N.C. 140, 142 (1905) ("Plaintiff may recover what we call nominal damages, which are really no pecuniary compensation, but which merely ascertain or fix his right or cause of action. Lord Holt has well said: 'Surely every injury imports a damage, though it does not cost the party one farthing, and it is impossible to prove the contrary; for a damage is not merely pecuniary, but an injury imports a damage when a man is thereby hindered of his right.' " (quoting *Ashby*, 2 Ld. Raymd. at 938)).[49]

Therefore, the word "injury" in the remedy clause of our Constitution's open courts provision, derived from the common-law concept of "*injuria*," means, at a minimum, the infringement of a legal right; not necessarily "injury in fact" or factual harm, derived from the contrary concept of "*damnum.*" Taking the remedy clause as a whole and in the context of this history, it cannot be understood to impose a *limitation* on the power of the courts to hear a claim, under the "injury in fact" test or otherwise.[50] For the same reason, the remedy clause cannot be understood to

---

[49] Lord Holt's rule in *Ashby* was well-established in North Carolina by 1855, prior to the 1868 Convention. *See, e.g., Bond v. Hilton*, 47 N.C. (2 Jones) 149, 150–51 (1855) (per curiam) ("Wherever there is a breach of an agreement, or the invasion of a right, the law infers some damage, and if no evidence is given of any particular amount of loss, it gives nominal damages, by way of declaring the right, upon the maxim, *ubi jus ibi remedium.*" (citing *Ashby v. White*, 1st Salk. 19)).

[50] Thirty-nine state constitutions have remedy clause provisions identical or similar to ours. *See* Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. at 1201–02 (identifying these provisions). The only state we have identified that construes the remedy clause of its open courts provision to impose a standing requirement is Texas, where our sister supreme court has held that "[u]nder the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an

impose a limitation on the legislature's power to create new legal rights. To the contrary, by its express terms, which provide that "every person for an injury done him . . . *shall have* remedy by due course of law," to the extent it implicates the doctrine of standing, our remedy clause should be understood as *guaranteeing* standing to sue in our courts where a legal right at common law, by statute, or arising under the North Carolina Constitution has been infringed. N.C. Const. Art. I, § 18, cl. 2 (emphasis added).

**G. The Law of Standing in North Carolina Summarized**

¶ 82     In summary, the "judicial power" under the North Carolina Constitution is plenary, and "[e]xcept as expressly limited by the constitution, the inherent power of the judicial branch of government continues." *Beard v. North Carolina State Bar*, 320 N.C. 126, 129 (1987). As an exercise of the judicial power entrusted in us by the people of North Carolina in our Constitution, we have the power and duty to determine the law in particular cases and, as a necessary incident of that duty, the power to conduct judicial review of executive and legislative actions for constitutionality when necessary to resolve a case. *Bayard*, 1 N.C. (Mart.) at 6–7. We have held that, in directly attacking the validity of a statute under the constitution, a party must show

---

injury," and has applied the standing principle of federal law, including *Lujan*. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (1993); *see id.* at 445 (citing *Lujan*, 504 U.S. 555). We are not persuaded by its reasoning. *See* Doggett, *"Trickle Down" Constitutional Interpretation*, 108 Col. L. Rev. at 878 (cautioning against adopting the Texas approach because it conflicts with the purposes underlying the adoption of open court provisions).

they suffered a "direct injury." *Summrell*, 239 N.C. at 594; *see also Stanley*, 284 N.C. at 28 (holding party must be "personally injured" to attack validity of statute). The personal or "direct injury" required in this context could be, but is not necessarily limited to, "deprivation of a constitutionally guaranteed personal right or an invasion of his property rights." *Summrell*, 239 N.C. at 594; *see also Canteen Services*, 256 N.C. at 166 (holding only persons "who have been injuriously affected . . . in their persons, property or constitutional rights" may challenge constitutionality of a statute). The direct injury requirement applicable in cases involving constitutional challenges to the validity of government action is a rule of prudential self-restraint based on functional concern for assuring sufficient "concrete adverseness" to address "difficult constitutional questions":

> " '[t]he "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' "

*Goldston*, 361 N.C. at 30 (quoting *Stanley*, 284 N.C. at 28 (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968))). When a person alleges the infringement of a legal right arising under a cause of action at common law, a statute, or the North Carolina Constitution, however, the legal injury itself gives rise to standing. The North Carolina Constitution confers standing to sue in our courts on those who suffer the infringement of a legal right, because "every person for an injury done him in his

lands, goods, person, or reputation shall have remedy by due course of law." N.C. Const. art. I, § 18, cl. 2. Thus, when the legislature exercises its power to create a cause of action under a statute, even where a plaintiff has no factual injury and the action is solely in the public interest, the plaintiff has standing to vindicate the legal right so long as he is in the class of persons on whom the statute confers a cause of action.[51]

**H. Standing under the Disclosure Statute**

¶ 83    Having followed the tortuous track through the thorny thicket of standing that brought us here, applying the law is simple. The Committee has alleged EMPAC violated the requirements of the Disclosure Statute. Part of the Disclosure Statute creates a cause of action permitting the candidate targeted by the illegal ad to enforce the regulations by bringing suit and establishing statutory damages he can seek. This provision is one of many where our General Assembly has provided for such private

---

[51] Showing a party falls within the class of persons on whom the statute confers a cause of action may require a showing of some special injury depending on the statutory terms. For instance, our zoning statutes confer standing to maintain a cause of action in the nature of certiorari appealing a quasi-judicial zoning action on certain classes of persons, including "person[s] who will suffer special damages as the result of the decision being appealed." N.C.G.S. § 160D-1402(c)(2) (Supp. 2 2020); *see Mangum*, 362 N.C. at 644. In certain cases, a cause of action may be implied from the statutory scheme. For example, to be entitled to administrative hearing under the NCAPA, a petitioner must show they are a "party aggrieved" by agency action, but where the underlying organic statute does not expressly create a right to a hearing, we have nevertheless held that those who "alleged sufficient injury in fact to interests within the zone of those to be protected and regulated by the [underlying] statute," would have a right to an administrative hearing under the NCAPA as a "person aggrieved." *Empire Power Co.*, 337 N.C. at 589.

enforcement. The record indicates the Committee has complied with the requirements of the Disclosure Statute.[52]

¶ 84        The Committee clearly falls under the class of persons on whom the Disclosure Statute confers a cause of action. Mr. Forest was the candidate against whom the ad below was run. He has assigned his interest in the case to his Committee. EMPAC contends that the Committee lacks standing because it cannot show "injury in fact" under *Lujan*. But, as discussed above, that is not the law of North Carolina. Under North Carolina law, the legislature may create causes of action, including "private attorney general actions" to vindicate even a purely public harm. Our requirement for a "direct injury" in cases where the plaintiff attacks the validity of a statute under the constitution does not apply here. Where the plaintiff has suffered infringement of a legal right arising under a statute that confers on a class of persons including the plaintiff a cause of action, and the plaintiff has satisfied the requirements of the statute, the plaintiff has shown standing under the North Carolina Constitution. Here, the Committee has standing based on the statutory cause of action created by the Disclosure Statute.

## IV.    Conclusion

---

[52] EMPAC and the dissent below argued that the Committee did not comply with the "condition precedent" of the Disclosure Statute. We disagree and hold the Committee has satisfied this condition precedent for the reasons stated in the majority opinion below.

The doctrine of standing in federal courts, including the "injury-in-fact" requirement, arises under the case-or-controversy provisions of the United States Constitution, by which exercise of the federal judicial power is limited. The North Carolina Constitution, by contrast, contains no analogous provision. Rather, in the context of standing, our "judicial power" is limited by principles of self-restraint requiring a "direct injury" when attacking the validity of a statute under the constitution. When a person alleges the infringement of a legal right directly under a cause of action at common law, a statute, or the North Carolina Constitution, however, the legal injury itself gives rise to standing. The North Carolina Constitution confers standing to sue in our courts on those who suffer the infringement of a legal right, because "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." N.C. Const. art. I, § 18, cl. 2.

AFFIRMED IN PART; DISRECTIONARY REVIEW IMPROVIDENTLY ALLOWED IN PART.[53]

Justices BERGER and BARRINGER did not participate in the consideration or decision of this case.

---

[53] We originally granted EMPAC's petition for discretionary review on the constitutionality of the Disclosure Statute. We decline to address that issue here.

Chief Justice NEWBY concurring in the result.

¶ 86        I agree with the result reached by the majority. Nonetheless, I write separately because I differ in the rationale. A system of fair elections is foundational to self-government. Our state constitution acknowledges this principle and allows the General Assembly broad authority to enact laws to protect the integrity of elections and thus encourage public trust and confidence in the election process. Under that authority, the General Assembly enacted a "stand by your ad" law in 1999, requiring political ads to contain particular information it deemed necessary to inform the public of the ad sponsor. A nonconforming ad provides inadequate information, thus harming the public generally and an affected candidate specifically. Part of that statute allowed a candidate affected by the illegal ad to enforce the regulations by bringing suit and established statutory damages he or she could seek. This provision is one of many where our General Assembly has provided for such private enforcement.

¶ 87        Misinformation harms the public, particularly when the misinformation concerns candidates for elected office. Indeed, the North Carolina Constitution recognizes the people's right to free elections, N.C. Const. art. I, § 10, which means that elections must be free from "interference," John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 56 (2d ed. 2013). The General Assembly, under its constitutional mandate to protect fair play in elections, addressed the generally

recognized threat that improper advertising poses to that goal. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 371, 130 S. Ct. 876, 916, 175 L. Ed. 2d 753, 802 (2010) (explaining that "disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way," and "[t]his transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages"); *Buckley v. Valeo*, 424 U.S. 1, 66–68, 96 S. Ct. 612, 657–58, 46 L. Ed. 2d 659, 714–15 (1976) (describing the various reasons the government has a significant interest in ensuring that the public is well informed on matters related to campaigning and political candidates).

¶ 88      Some states may address this problem through criminal punishment or civil penalty for intentional violations of disclosure laws. *See Friends of Joe Sam Queen v. Ralph Hise for N.C. Senate*, 223 N.C. App. 395, 403 n.7, 735 S.E.2d 229, 235 n.7 (2012) (explaining the approaches to enforcement various states have taken). The General Assembly chose a different enforcement mechanism. By allowing actions by those candidates who have been affected by unlawful ads, the General Assembly sought to meaningfully secure a vital public interest and grant a specific legal path for the injured candidate to address the wrong. *See* N.C. Const. art. I, § 18. The General Assembly perhaps recognized that it is difficult to monitor all campaign ads, that the public is harmed even by unintentional misinformation, and that the affected candidate has the greatest incentive to pursue a remedy for illegal ads.

¶ 89    Specifically, the General Assembly provided that when any entity creates a political campaign ad that violates certain disclosure requirements, the candidate affected by the unlawful ad *"shall have* a monetary remedy in a civil action against" the violator. N.C.G.S. § 163-278.39A(f) (2011) (emphasis added) (repealed 2014). The injuries to the public, to the election process, and to the individual candidate are hard to quantify: what is the monetary value of misleading information that may affect an election? The General Assembly thus provided for statutory damages. That monetary remedy is, according to the statute, equal to the amount the violating party spent to broadcast the unlawful ad. N.C.G.S. § 163-278.39A(f)(2). Only those candidates who have not violated any of the statutory provisions themselves may sue. N.C.G.S. § 163-278.39A(f). The candidate must file a notice of the complaint with the Board of Elections by the Friday following Election Tuesday. N.C.G.S. § 163-278.39A(f)(1). By the language of the statute, the General Assembly has decided that a candidate who complies with these requirements and shows a violation is entitled to statutory damages.

¶ 90    Plaintiff here has complied with all the statutory requirements. First, there is no evidence that plaintiff has violated any disclosure requirement; plaintiff has clean hands, as the General Assembly required. Next, both defendant and the Board of Elections received notice of the violation within the statutory period. Thus, sufficient evidence exists to show that plaintiff complied with any condition precedent to suing.

There is no dispute that plaintiff's complaint precisely tracks the requirements of the statute.

The only remaining question, then, is whether subsection 163-278.39A(f) is enforceable as written; in other words, is the statute constitutional? It is. Here the General Assembly used its longstanding constitutional authority to create causes of action like this one.

All political power resides in the people, N.C. Const. art. I, § 2, and the people act through the General Assembly. *State ex rel. Ewart v. Jones,* 116 N.C. 570, 570, 21 S.E. 787, 787 (1895) ("[T]he sovereign power resides with the people and is exercised by their representatives in the General Assembly."). The General Assembly therefore may presumptively take any legislative action not specifically prohibited by the North Carolina Constitution. *McIntyre v. Clarkson,* 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961) ("[A] doctrine firmly established in the law is that a State Constitution is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it." (alteration in original) (quoting *Lassiter v. Northampton Cnty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd,* 360 U.S. 45, 54, 79 S. Ct. 985, 991, 3 L. Ed. 2d 1072, 1078 (1959))). Thus, as this Court has regularly noted, any alleged constitutional limitation on the General Assembly's

power must be express and demonstrated beyond a reasonable doubt. *E.g., Hart v. State,* 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

¶ 93        In keeping with its general legislative power, the General Assembly has the authority to recognize threats to the public good, identify an injury, and provide for the appropriate remedy. A statute may create a private cause of action even if the common law would not provide that right. *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (The General Assembly is inarguably "the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, the statute supplants the common law rule and becomes the public policy of the State in respect to that particular matter." (quoting *McMichael v. Proctor*, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956))).

¶ 94        The General Assembly may therefore create "private attorney general actions." Private attorney general actions allow nongovernmental actors to enforce laws. These actions are integral to the well-being of this State's citizens. They are often used when the harm is to the public generally and is difficult to quantify. Such a statute by its own accord recognizes that an injury has occurred and allows a specified party to sue for recovery. *See, e.g.*, *Mayton v. Hiatt's Used Cars, Inc.*, 45 N.C. App. 206, 212, 262 S.E.2d 860, 864 (1980) (indicating that when a statute allows for a private attorney general action, it may be irrelevant whether the party bringing the suit has suffered an "actual injury"). For an action to qualify as one brought by a private attorney

general, the action usually must address a right that is important to the public interest and provide for private enforcement. *See, e.g.*, *Stephenson v. Bartlett*, 177 N.C. App. 239, 244, 628 S.E.2d 442, 445 (2006) (explaining the traditional treatment of private attorney general actions in the context of awards of attorney's fees). These actions deter wrongdoing by incentivizing private parties to prosecute violations.

¶ 95          Indeed, the General Assembly has established a private enforcement mechanism like the one in this case in several other statutes. For example, North Carolina's Open Meetings Law, which requires certain government meetings to be open to the public, allows for such suits. It says that "[a]ny person" may bring a suit for an injunction to force the government entity to comply with the law, and "the plaintiff need not allege or prove special damage different from that suffered by the public at large." N.C.G.S. § 143-318.16A(a) (2019). The law allows the plaintiff to be awarded attorney's fees upon prevailing in such a suit. N.C.G.S. § 143-318.16B (2019).

¶ 96          Some laws go even further, mirroring the statute in this case, by providing for specified statutory damages without requiring the plaintiff to prove actual injury. *See* N.C.G.S. § 75-56(b) (2019) ("Any debt collector who fails to comply with any provision of this Article with respect to any person is liable to such person in a private action in an amount equal to the sum of (i) any actual damage sustained by such person as a result of such failure and (ii) civil penalties the court may allow, but not less than

five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for each violation."); *see also* N.C.G.S. § 75-118(a)(2) (2019) (providing that any recipient of an unsolicited facsimile may bring a suit to recover "five hundred dollars ($500.00) for the first violation, one thousand dollars ($1,000) for the second violation, and five thousand dollars ($5,000) for the third and any other violation that occurs within two years of the first violation"). The General Assembly has therefore used its constitutional authority to recognize public injuries, declare an appropriate plaintiff, and fashion a proper remedy on several occasions, including in this case.

Private attorney general actions with statutory damages serve to vindicate the rights of an injured public when harm is hard to quantify. The General Assembly, within its constitutional authority, provided for such a cause of action and such damages in this case. Plaintiff has the right to sue under this statute, and neither the North Carolina Constitution nor this Court's precedent limit courts from hearing the case.

I respectfully concur in the result.